**AIR TRANSPORT ASSOCIATION OF AMERICA, INC., Petitioner**

**v.**

**FEDERAL AVIATION ADMINISTRATION, Respondent**

**Air Line Pilots Association, International, et al., Intervenors**

**Air Transport Association of America, Petitioner**

**v.**

**Federal Aviation Administration, Respondent**

**Regional Airline Association, Petitioner**

**v.**

**Federal Aviation Administration, Respondent**

**Nos. 01–1027, 01–1303 & 01–1306.**

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 18, 2002.

Decided May 31, 2002.

Michael S. Sundermeyer argued the cause for Air Transport Association of America, Inc.

Lorraine B. Halloway argued the cause for Regional Airline Association. R. Bruce Keiner Jr. was on brief.

Edward Himmelfarb, Attorney, United States Department of Justice, argued the cause for the Federal Aviation Administration. Robert S. Greenspan, Attorney, United States Department of Justice, was on brief.

Joseph L. Manson III and Douglas W. Hall were on brief for intervenor, Regional Aviation Partners.

Jonathan A. Cohen, James W. Johnson and Daniel M. Katz were on brief for intervenors Air Line Pilots Association, International and Coalition of Airline Pilots Associations.

Before: EDWARDS, HENDERSON and GARLAND, Circuit Judges.

Opinion for the court filed by Circuit Judge HENDERSON.

KAREN LeCRAFT HENDERSON, Circuit Judge:

Air Transport Association of America, Inc. (ATA) and Regional Airline Association (RAA) seek review of the Federal Aviation Administration's November 20, 2000 interpretation (issued by letter) of Federal Aviation Regulation 121.471, 14 C.F.R. § 121.471 (FAR 121.471), and attendant Notice of Enforcement Policy (Notice) entitled "Flight Crewmember Flight Time Limitations and Rest Requirements," published in the Federal Register, 66 Fed. Reg. 27,548 (May 17, 2001). ATA contends the letter interpretation and Notice are inconsistent with the plain language of FAR 121.471. In addition, ATA maintains that the letter interpretation constitutes a substantive change to FAR 121.471 and, accordingly, requires notice-and-comment rulemaking under the Administrative Procedure Act (APA), 5 U.S.C. §§ 551 *et seq.* We disagree.

I.

The Federal Aviation Act of 1958, 49 U.S.C. §§ 40101 *et seq.* (Act), directs the Administrator of the Federal Aviation Administration (FAA) to "promote safe flight of civil aircraft in air commerce" by prescribing "regulations in the interest of safety for the maximum hours or periods of service of aircrew and other employees of air carriers." 49 U.S.C. § 44701(a)(4). The rules issued by the FAA under section 44701(a)(4) of the Act are generally referred to as "flight time limitations."[1] In 1985, pursuant to notice-and-comment rulemaking, the FAA promulgated FAR 121.471, establishing flight time limitations and rest requirements for "flight crewmembers engaged in air transportation." *See Flight Time Limitations and Rest Requirements,* 50 Fed.Reg. 29,306 (July 18, 1985). While the FAA was focused on simplifying scheduling and giving air carriers added scheduling flexibility, it also not-

---

1. The flight time limitation rules applicable to "major scheduled air carriers" and "other airlines operating large transport category airplanes" are contained in Part 121 of the FAR. The flight time limitation rules applicable to scheduled air carriers operating airplanes of 30 or fewer seats and air taxi operations are contained in Part 135 of the FAR. The substance of the rules in Parts 121 and 135 is essentially the same and the rules are likewise interpreted.

ed in the notice of proposed rulemaking that the "current Part 121 rule ... provides no protection against acute short-term fatigue for crewmembers." *See Flight Time Limitations and Rest Requirements for Flight Crewmembers*, 49 Fed.Reg. 12,136, 12,136–7 (March 28, 1984). The regulation allows a domestic airline "certificate holder" to schedule, and a crewmember to accept, a flight assignment only if the crewmember's total flight time does not exceed yearly, monthly and weekly maximum flight time limitations. 14 C.F.R. § 121.471(a)(1)-(3). In addition, the regulation establishes a maximum of eight hours of flight time between "required rest periods." 14 C.F.R. § 121.471(a)(4). Pursuant to subsection (b), during the twenty-four consecutive hours preceding "the scheduled completion of any flight segment," a crewmember must be scheduled for a rest period of at least nine consecutive hours for eight hours or fewer of "scheduled flight time"; ten consecutive hours of rest for more than eight but fewer than nine hours of "scheduled flight time"; and eleven hours of rest for nine or more hours of "scheduled flight time." *Id.* § 121.471(b)(1)-(3). Subsection (c), however, allows a carrier a measure of scheduling flexibility by way of a "compensatory rest period." A required rest period of nine hours may be "scheduled for or reduced to" a minimum of 8 hours if the crewmember is given compensatory rest of at least ten hours "begin[ning] no later

than 24 hours after the commencement of the reduced rest period." *Id.* § 121.471(c)(1).[2] Compensatory rest, like required rest under paragraph (b), may not be reduced or delayed under any circumstances. *See* 14 C.F.R. § 121.471(e); *see also* 50 Fed.Reg. at 29314 ("If a flight crewmember does not receive the required number of hours of rest, the operator and the flight crewmember are in violation of the regulation").[3]

On September 26, 2000 Captain Richard D. Rubin, Chairman of the Flight Time—Duty Time Committee of the Allied Pilots Association, submitted to the FAA several questions regarding FAR 121.741, which questions apparently arose as a result of changes in American Airlines's pilot reserve system. On November 20, 2000 FAA Deputy Counsel James Whitlow responded by letter (Whitlow Letter) to Rubin's questions. The Whitlow Letter begins by stating that FAR 121.471(b)(1) requires a minimum of nine consecutive hours of scheduled rest in the twenty-four hours preceding eight or fewer hours of "scheduled flight time." The nine hours' rest period may be reduced pursuant to FAR 121.471(c)(1) to a minimum of eight hours if a minimum of ten hours of compensatory rest begins no later than twenty-four hours after the commencement of the reduced rest period. More significantly, the Whitlow Letter provides that "look-back" rest[4] is computed by using "actual

---

**2.** Subsection (c)(2) provides that required rest under (b)(2)—ten hours for between eight and nine hours of scheduled flight time—may be reduced to a minimum of eight hours if the crewmember is given a compensatory rest of at least eleven hours and (c)(3) provides that required rest under (b)(3) may be reduced to eight hours if compensatory rest of at least twelve hours begins no later than twenty-four hours after commencement of the reduced rest period. *See* 14 C.F.R. § 121.471(c)(2) & (3).

**3.** While subsection (g) of FAR 121.471 provides that flight time limits can be exceeded based on circumstances beyond the certificate holder's control (such as adverse weather conditions), it does not apply to the specified rest requirements which allow only the scheduling flexibility spelled out in section 121.471(c). 14 C.F.R. § 121.471(g).

**4.** The FAA defined "look-back rest" in an earlier rulemaking, noting that "the rest requirement is based on the number of flight hours looking back 24 hours from the com-

expected flight time and taxi-in time, based on the specific conditions that exist on the day, to determine the scheduled arrival time for purposes of determining whether a flight should be commenced." Whitlow Letter at 3. Irrespective of the carrier's *published* flight time, then, "scheduled flight time" under FAR 121.471 should be calculated (or recalculated) using the actual conditions on the day of departure regardless whether the length of the flight is longer or shorter than the originally scheduled flight time. Once this information is calculated, "[i]f it is known, or reasonably should be known, that a flight segment will result in less than eight hours of look-back rest for a particular crew, the flight may not leave the gate." Whitlow Letter at 4.[5]

On January 18, 2001 ATA petitioned for review of the Whitlow Letter (No. 01–1027) and RAA intervened. Four months later, the FAA published in the Federal Register note of its intent to "rigorously enforce existing regulations governing flight crewmember rest requirements." Notice, 66 Fed.Reg. at 27,548 (May 17, 2001). The Notice incorporated the Whitlow Letter and advised that, within six months of the date of the Notice's publication, the FAA intended to begin a comprehensive review of flight scheduling practices and to "deal stringently with any violations." *Id.* ATA and RAA then filed

separate petitions for review of the Notice (Nos. 01–1303 and 01–1306). We consolidated for review all three petitions. *See* July 25, 2001 Consolidation Order.[6] On September 5, 2001 we granted ATA's motion to stay the Notice.

## II.

### A. FAA's Interpretation of FAR 121.471

Because the Whitlow Letter[7] constitutes the FAA's interpretation of its own regulation, that interpretation must be afforded substantial deference and upheld unless "plainly erroneous or inconsistent with the regulation." *Thomas Jefferson Univ. v. Shalala,* 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994); *see also Paralyzed Veterans of America v. D.C. Arena L.P.,* 117 F.3d 579, 584 (D.C.Cir.1997), *cert. denied,* 523 U.S. 1003, 118 S.Ct. 1184, 140 L.Ed.2d 315 (1998). Accordingly, we defer to the FAA's view unless "an alternative reading is compelled by the regulation's plain language or by other indications of the [agency's] intent at the time of the regulation's promulgation." *Thomas Jefferson Univ.,* 512 U.S. at 512, 114 S.Ct. at 2386–87 (*quoting Gardebring v. Jenkins,* 485 U.S. 415, 430, 108 S.Ct. 1306, 99 L.Ed.2d 515 (1988)). ATA contends that the Whitlow Letter, by requiring the recalculation of a previously com-

---

pletion of each flight segment. If a pilot is scheduled for 4 hours of flight time late on the first day and receives a reduced rest of 8 hours, he or she can only be scheduled for up to 5 hours of flight time the following morning, since the flight crewmember cannot be scheduled for 9 or more flight time hours in 24 consecutive hours, based on an 8 hour reduced rest period." *Flight Time Limitations and Rest Requirements,* 50 Fed.Reg. at 29,313.

5. If the flight is away from the gate but not yet in the air, the flight may not take off. As a matter of enforcement policy, the FAA will

not charge a violation of the rest requirements if a delay that first becomes known after the flight is in the air disrupts the scheduled flight time, provided the required minimum reduced rest and the compensatory rest occur at the completion of that flight segment. *See* Whitlow Letter at 4.

6. Petitioners ATA and RAA are hereinafter referred to collectively as ATA.

7. The "Whitlow Letter" hereinafter refers to both the Letter and the Notice.

puted rest period, is inconsistent with both the text and the purpose of FAR 121.471. ATA maintains that the phrase "scheduled completion of any flight segment" in subsection (b) means that compliance with FAR 121.471 turns solely on the legality of the originally established flight schedule irrespective of any unexpected flight delay that may require *re*-scheduling. *See* ATA Blue Br. at 25. The phrase, ATA asserts, cannot be squared with the Whitlow Letter, which requires scheduled flight time to take into account "actual expected flight time." *See* Whitlow Letter at 4.

■ The FAA responds that the phrase "scheduled completion of any flight segment" can reasonably be understood to include a re-scheduled flight time based on actual flight conditions. To be sure, "scheduled completion" *can* be construed narrowly to refer only to the originally scheduled flight completion time. The point, however, is that the FAA's more expansive interpretation is not unreasonable. A *re*scheduled completion of a flight segment based on flight conditions existing in fact is nonetheless a "scheduled" completion. Nothing in the text of FAR 121.471 or in the ordinary usage of the word "scheduled"[8] dictates that the timetable of a particular flight segment can be determined only when the schedule is originally created regardless of adjustments made necessary by then-current conditions.

ATA's interpretations of subsection (b)'s term "scheduled rest period" and subsection (c)'s reference to "reduce a scheduled rest" are similarly unavailing. Its construction of "scheduled rest" would allow a carrier to set up adequate rest periods in advance and then disregard whether the rest periods in fact occurred in light of actual flight conditions because, under its construction, "scheduled rest" means "rest [that] is lawfully established at the time of scheduling." ATA Blue Br. at 26. ATA argues that the term refers only to a *future* rest period and cannot justify a retrospective recalculation of rest a crewmember has already taken. Even if the semantic point were valid, which we doubt as set forth below, this argument ignores the structure of the regulation itself. Under FAR 121.471, all rest requirements flow from the "scheduled completion" of a particular flight segment. The minimum rest requirements described in subsection (b) are all keyed to the twenty-four hour period before the completion is to occur. The required rest must be scheduled during those 24 hours. The carrier's first step therefore must be to determine this scheduled completion time. It must then be able to look back from that point to find a sufficient rest period scheduled within the previous twenty-four hours. Once that hour is allowed to change in response to unanticipated delays, what is then recalculated is not (as ATA claims) the rest that a crewmember has *already* received but instead the 24–hour period in which the requisite amount of scheduled rest must occur. Moreover, ATA's prospective-only view of "scheduled" is inconsistent with the ordinary meaning of the word; a rest period already calculated, then recalculated, can yet be understood as "scheduled" because it has been "place[d] on a schedule." *See Webster's Third New International Dictionary Unabridged* 2028 (1993) ("schedule: *vt-ed*" means "to place [o]n a schedule"). Nor does subsection (c), in allowing a carrier

---

8. One definition of "schedule" is a "procedural plan that indicates the time and sequence of each operation." *Webster's Ninth New Collegiate Dictionary* 1050 (1990). Completion of a flight segment that allows for elapsing flight conditions is a "scheduled" completion within that definition.

to "reduce a scheduled rest," mean that a rest period already completed cannot be recalculated in light of actual flight times.

Further, the Whitlow Letter is not inconsistent with the purpose of the 1985 amendment to FAR 121.471. Granted that simplified scheduling and added scheduling flexibility for carriers were two goals of the 1985 amendment, it does not necessarily follow that an interpretation cabining a carrier's flexibility is therefore unauthorized. The Whitlow Letter, while imposing a measure of rigidity, nonetheless maintains the system of flexible scheduling created by the amendment. Moreover, "protection against acute short-term fatigue" of crewmembers was also one of the FAA's goals. *Flight Time Limitations Rest Requirements for Flight Crewmembers,* 49 Fed.Reg. at 12,137. The rest requirement regulation was expressly promulgated under FAA's statutory authority to issue "reasonable rules and regulations governing, in the interest of safety, the maximum hours or periods of service of aircrew and other employees of air carriers." *Id.* at 12,136 (citing statutory requirements codified at 49 U.S.C. § 44701(a)(4)). While the 1985 amendment may have been aimed at increasing scheduling flexibility, the FAA is statutorily obligated to strike the best balance between flexibility and safety. Having concluded the FAA's interpretation *via* the Whitlow Letter represents a permissible construction of FAR 121.471, we do not believe the fact that it may lessen flexibility renders it invalid.

## B. APA Issues

The FAA issued the Whitlow Letter without formal notice and comment procedures. In so doing, ATA claims, the FAA violated the APA because the Whitlow Letter (1) is a substantive, not an interpretative, rule and (2) materially changes the FAA's earlier interpretations of the required rest regulation. We disagree. The interpretation contained in the Whitlow Letter is "fairly encompassed" within the regulation it purports to construe and, therefore, under our circuit precedent is an interpretative rule exempt from notice-and-comment rulemaking. Moreover, none of the FAA's earlier interpretations of FAR 121.471 addresses precisely the issues addressed in the Whitlow Letter. Accordingly, the Whitlow Letter does not mark a departure from the past.

### 1. Substantive vs. Interpretative Rule

The APA requires federal agencies to publish "[g]eneral notice of proposed rulemaking" in the Federal Register, 5 U.S.C. § 553(b), and "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments," 5 U.S.C. 553(c). Section 553, however, exempts "interpretative rules" and "general statements of policy" from notice and comment procedures. 5 U.S.C. § 553(b)(3)(A). Nonetheless, it is well established that an agency may not label a substantive change to a rule an interpretation simply to avoid the notice and comment requirements. *See Appalachian Power Co. v. EPA,* 208 F.3d 1015, 1024 (D.C.Cir.2000).

The distinction between a substantive rule and an interpretive rule can be less than clear-cut. *See Syncor Int'l Corp. v. Shalala,* 127 F.3d 90, 93–94 (D.C.Cir.1997) (listing cases); *General Motors Corp. v. Ruckelshaus,* 742 F.2d 1561, 1565 (D.C.Cir.1984) (en banc) (describing distinction as "enshrouded in considerable smog") (citation omitted). One factor we consider in distinguishing between the two is "whether the interpretation itself carries the force and effect of law, ... or rather whether it spells out a duty *fairly encom-*

*passed within the regulation* that the interpretation purports to construe." *Paralyzed Veterans*, 117 F.3d at 588 (internal citation omitted) (emphasis added). The Whitlow Letter's interpretation of FAR 121.471, we believe, is "fairly encompassed" within the required rest regulation and is, therefore, exempt from notice-and-comment rulemaking. The FAA reasonably interpreted the required rest regulation itself to require a carrier to recalculate past rest periods in light of actual flight times, including those scheduled flight times required to be rescheduled by existing flight conditions. We cannot say that "in the absence of the [Whitlow Letter] there would not be an adequate legislative basis to ... ensure the performance of duties." *American Mining Congress v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1112 (D.C.Cir.1993). The provisions of FAR 121.471 incorporate both the statutory requirement that the FAA establish flight time limitations and required rest regulations "in the interest of safety" and the phrase "scheduled completion of any flight segment," which is reasonably understood to include a completion re-scheduled because of actual flight conditions. FAR 121.471 itself, then, provides the FAA with sufficient authority to impose the recalculation duty. The Whitlow Letter does not impose "new rights or duties," *Orengo Caraballo v. Reich*, 11 F.3d 186, 195 (D.C.Cir.1993), and therefore does not require notice-and-comment rulemaking.[9]

### 2. Relation to Prior Agency Interpretations

 Even if the Whitlow Letter is an interpretative rule, ATA further contends,

notice-and-comment rulemaking is nonetheless required because the Letter is inconsistent with earlier FAA interpretations of FAR 121.471. "Rulemaking," as defined in the APA, includes not only the agency's formulation, but also its modification, of a rule. *See* 5 U.S.C. § 551(5) ("rule making" includes "agency process for formulating, amending, or repealing a rule"); *see also Paralyzed Veterans*, 117 F.3d at 586 ("Under the APA, agencies are obligated to engage in notice and comment before formulating regulations, which applies as well to *'repeals'* or *'amendments.'*" (emphasis in original)). As the United States Supreme Court has noted, APA rulemaking is required if an interpretation "adopt[s] a new position inconsistent with ... existing regulations." *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 100, 115 S.Ct. 1232, 131 L.Ed.2d 106 (1995). In *Alaska Prof'l Hunters Ass'n v. FAA*, 177 F.3d 1030 (D.C.Cir.1999), we held that "[w]hen an agency has given its regulation a *definitive interpretation*, and later *significantly revises* that interpretation, the agency has in effect amended its rule, which requires notice and comment." *Id.* at 1034 (citation omitted) (emphasis added); *see also Paralyzed Veterans*, 117 F.3d at 586 (agency violates APA if it makes a "fundamental change in its interpretation of a substantive regulation without notice and comment"). In *Alaska Hunters*, Alaskan guides who transport their customers to hunting and fishing sites by airplane challenged the FAA's requirement (imposed *via* a Notice to Operators) that they comply with FAA regulations applicable to commercial pilots. *Id.* at 1033. The Notice, promulgated without notice and com-

---

9. Although *American Mining Congress* identifies four factors, any one of which demarks a legislative (as opposed to interpretative) rule, we apply both the first and fourth factors together to the Whitlow Letter. Because the Whitlow Letter was not published in the Code of Federal Regulations, nor did the FAA "explicitly invoke[] its general legislative authority," the second and third factors are inapplicable. *American Mining Congress*, 995 F.2d at 1112.

ment, reversed the FAA's thirty-year interpretation that had exempted the guides. *Id.* The longstanding advice, we held, had become "an authoritative departmental interpretation, an administrative common law applicable to Alaskan guide pilots"; hence, the Notice changing that interpretation had to comply with notice-and-comment rulemaking. *Id.* at 1035.

■ ATA claims the Whitlow Letter changed "fifteen years of [i]nterpretations" because "recalculation of past rest periods [h]as never [been] required, even though the opportunity to impose such a mandate was presented." Reply Br. at 17. Of the prior interpretations ATA relies on, only one merits discussion. Interpretation 1992–24, like the Whitlow Letter, represents the FAA's response to a request for an interpretation of FAR 121.471. The request asked if a flight delay not caused by the air carrier meant that "looking back 24 hours from the actual completion time of the last flight, you will not be able to find the applicable rest period required under FAR 121.471(b) and (c)." Interpretation 1992–24 at I–235 (JA 252). Pointing to the prospective language in FAR 121.471,[10] the FAA declared that "deviations encountered in the operation of an otherwise legitimately scheduled flight are permitted" so long as the schedule otherwise met the flight time limitations and rest requirements. *Id.* Interpretation 1992–24 did not, according to ATA, "require recalculation of past rest based on actual expected arrival time, [nor] ...

mandate that a normal, completed paragraph-(b) rest be turned, after the fact, into a paragraph-(c) reduced rest." Reply Br. at 22. The FAA insists that Interpretation 1992–24 speaks only to a short delay that would still allow a carrier to give crewmembers compensatory rest immediately following the extended flight, relying on the following caveat contained in Interpretation 1992–24: "It is important to note[,] however, that the delay cannot infringe on the next required rest period." In the FAA's view, then, Interpretation 1992–24 addresses only an alteration in the scheduled flight time short enough to nonetheless provide for compensatory rest following the reduced rest in accordance with subsection (c). In contrast, the Whitlow Letter addresses a delay that makes compliance with either subsection (b) or (c) impossible in light of actual flight conditions. Although Interpretation 1992–24 was not *expressly* limited to short delays, it nevertheless does not provide a "definitive" interpretation inconsistent with that of the Whitlow Letter. The FAA did not define the phrase "operation of an otherwise legitimately scheduled flight" in Interpretation 1992–24; if "operation" refers only to the in-flight segment of a flight schedule, Interpretation 1992–24 is simply a restatement of the FAA's longstanding enforcement policy not to charge a rest violation for a delay that occurs *after takeoff. See also* Interpretation 1998–7 at I–207. Because Interpretation 1992–24 can reasonably be interpreted in this way,[11] we

10. Under the scheduling provisions of FAR 121.471(a) and (b), no air carrier "may" schedule a flight crewmember and no flight crewmember "may" accept an assignment in excess of the specified flight time limitations and rest requirements. *See* Interpretation 1992–24; *see also* Interpretation 1989–16 ("The key language of the regulation is, '... may schedule ...,' '... may accept ...,' and '... scheduled completion of any flight ...,' all of which are prospective in application.").

11. In Interpretation 1992–94, the FAA suggested that "The regulation restricts an air carrier's *scheduling* of a pilot and a pilot's accepting an assignment at the time of scheduling." (Emphasis in original). In saying this, however, the agency in no way purported to limit the definition of time of scheduling to time of *original* scheduling. The Whitlow Letter can be seen as supplementing the earlier interpretation by more precisely construing

do not believe the Whitlow Letter "significantly revises" a previous "definitive interpretation" of FAR 121.471. *See Alaska Hunters,* 177 F.3d at 1034.

Other prior interpretations of FAR 121.471 buttress our conclusion that the Whitlow Letter, in clarifying a carrier's duty to recalculate previously computed rest periods based on actual flight schedules, addresses only a theretofore unresolved aspect of the rest requirement. In a letter dated July 22, 1994 the FAA construed FAR 121.471 to require that a "rest period must occur '. . . during the 24 hours *preceding* the scheduled completion of any flight segment' " rather than following the flight segment. *See* Interpretation dated July 22, 1994 (emphasis in original) (quoting FAR 121.471(b)). While ATA is correct that the July 22, 1994 letter does not specifically require recalculation of a rest period caused by an unforeseen delay, it does nonetheless indicate that the FAA, in 1994, required a carrier to provide a compensatory rest period of ten hours at the end of day one despite the fact that the crewmembers had received an extended rest period (more than 24 hours) preceding the scheduled completion of flight segment. More significantly, in Interpretation 1998–7, the FAA declared that both the carrier and its crewmembers would violate FAR 121.471 if they knew "prior to departure" that due to a ground hold for weather the "scheduled arrival time of the last flight segment would force the crew to begin its compensatory rest period later than 24 hours after the commencement of

the reduced rest period." Interpretation 1998–7. The FAA's conclusion was based on the "actual expected arrival time" calculated prior to departure and is therefore consistent with its approach in the Whitlow Letter.

No prior FAA interpretation of FAR 121.471 approaches the definitive interpretation that mandated notice-and-comment rulemaking in *Alaska Hunters.* No prior interpretation reflects an "administrative common law" that FAR 121.471 prohibits recalculation of past rest periods based on "actual expected flight time." *Alaska Hunters,* 177 F.3d at 1035; see also *Hudson v. FAA,* 192 F.3d 1031, 1036 (D.C.Cir. 1999) (FAA interpretation did not require notice and comment because it was simply "application of the regulation to a changed situation which calls for a different policy"). Accordingly, the Whitlow Letter does not alter a definitive prior FAA interpretation of FAR 121.471.

For the foregoing reasons, the consolidated petitions for review are denied.

*So ordered.*

---

the term to refer to scheduling that occurs any time before the flight in question departs. Nor does the fact that the FAA previously referred to the regulation as "prospective in application" suggest any inconsistency with the Whitlow Letter. Even as we construe it, the regulation applies prospectively from the time of scheduling; the Whitlow Letter declares that the "scheduling" can be done up

to departure. While Interpretation 1992–94 may not have specifically adopted this construction of scheduling, it in no way rejected it. Interpretation 1992–94 is best understood as an ambiguous statement whose details the Whitlow Letter has now filled in. Because there is no discontinuity between the two, notice and comment were not required.