PAN AMERICAN AIRWAYS
CORP., Plaintiff,

v.

AIR LINE PILOTS ASSOC.,
Int'l. Defendant.

Air Line Pilots Assoc., Int'l., Plaintiff

v.

Pan American Airways
Corp., Defendant.

Nos. CIV.A. 01–2357(JDB),
CIV.A. 02–0143(JDB).

United States District Court,
District of Columbia.

June 19, 2002.

John Robert Fornaciari, Washington, DC, for Plaintiff.

Eugene B. Granof, Airline Pilots Association Legal Department, John E. Wells, IV, Air Line Pilots Association Herndon, VA, for Defendant.

## MEMORANDUM OPINION

BATES, District Judge.

Pan American Airways Corporation ("Pan Am") and the Air Line Pilots Association, International ("ALPA") are before the Court on cross-motions for summary judgment in these consolidated cases. Pan Am brought suit here to vacate the award of the Pan American Airways Systems Board of Adjustment ("Arbitration Board") requiring the reinstatement of Captain Donald Simonds, a Pan Am pilot terminated after he refused to fly a plane because he believed it would force him to violate a Federal Aviation Administration regulation. ALPA initially brought suit in the District of New Hampshire to enforce the Arbitration Board's award, but the parties agreed to consolidate the two cases here. After considering the parties' motions and oral argument, the Court concludes that the Arbitration Board's award must be upheld in light of the extremely narrow review available in this Court, because the award is drawn from the essence of the collective bargaining agreement and does not violate public policy.

## FACTUAL BACKGROUND

Since November 15, 1999, ALPA and Pan Am have operated under a collective bargaining agreement ("Agreement") that includes a "management rights" clause which states that "[e]xcept as expressly restricted by this Agreement, the Company retains all authority and rights to manage its operations and direct its pilot workforce." Agreement, Section 1.C. It also includes a provision prohibiting Pan Am from disciplining or discharging a pilot "without just cause." *Id.*, Section 19.A.

On September 20, 2000, the chairman of the Allied Pilots Association sent an inquiry to the Federal Aviation Administration ("FAA") with a number of hypothetical scenarios regarding the FAA's interpretation and application of certain Federal Air Regulations ("FARs"), including 14 C.F.R. § 121.471, which sets federal limits on the amount of flight time and rest requirements for pilots. *See* Pan Am Motion, Ex. D. Promulgated in 1985, FAR § 121.471 prohibits an airline from scheduling—and

a pilot from accepting—any assignment that would require flight duty for more than 16 hours during a 24-hour period. Pan Am has maintained that the industry understood the regulation to mean that while a pilot could not be *scheduled* for more than 16 hours of duty, a pilot could *complete* a properly scheduled assignment that went beyond 16 hours due to a delay in assignment caused by weather, mechanical or air traffic problems. *See* September 13, 2001 Arbitration Board Opinion ("Board Op.") at 2.

The FAA's Deputy Chief Counsel, James W. Whitlow, responded on November 20, 2000. *See* Pan Am Complaint ¶ 12. Whitlow's response ("Whitlow Letter") stated that the FAA would interpret FAR § 121.471 to prohibit a pilot from even *initiating* a flight or a leg of a flight if the anticipated arrival time was not within 16 hours of the pilot's initial takeoff, notwithstanding any weather, mechanical, or air traffic delays. Board Op. at 2. On December 1, 2000, ALPA sent copies of the Whitlow Letter to Captain Larry Schott, the chairman of its Master Executive Committee, and shortly thereafter disseminated the letter to ALPA pilots. *Id.*[1]

Captain Don Simonds is a pilot with 33 years of flying experience—including 28 years with commercial airlines, 11 of those with Pan Am—who over the course of his lengthy career had never been disciplined by an employer or the FAA. *Id.* at 1. On January 3, 2001, Pan Am scheduled Simonds to fly a four-leg flight from Ports-

mouth, New Hampshire to Bangor, Maine; from Bangor to Pittsburgh, Pennsylvania; from Pittsburgh to Sanford, Florida; and then return from Sanford to Portsmouth— a schedule that would finish in under 14 hours, safely within the FAA's regulation and interpretation. Pan Am Complaint ¶ 8; *see also* Board Op. at 1. After timely completing the first three legs of this flight schedule, Simonds's plane developed mechanical problems. Pan Am Complaint ¶ 9. Following a lengthy delay, it became clear to Simonds that he could not push back from the gate at Sanford in time to return to Portsmouth within the FAA's 16-hour time limit. Board Op. at 2. Simonds informed Pan Am's Director of Operations, Captain Jim Baker, that he and the other two members of his crew would not fly the plane, citing his "take on the law" pursuant to the Whitlow Letter, because the last leg of the flight would violate FAR § 121.471, creating a risk of punishment for both Pan Am and Simonds.[2] Baker told Simonds that Pan Am disputed this interpretation of the FAR, and that Simonds and his crew would be in serious trouble if they did not complete the flight as scheduled. Simonds nonetheless refused to fly, left the plane (with 149 passengers on board), and checked into a hotel. Board Op. at 2–3. Baker, who himself replaced Simonds to fly the plane, immediately terminated Simonds for insubordination (the other two crewmembers reluctantly agreed to fly after Pan Am threatened them with termination as well).

1. Captain Schott was one of the first Pan Am pilots to run up against this new FAA interpretation during a flight in December 2000. When he realized that he could not take off and land within the new 16-hour limit, he informed Pan Am that he would not fly under the Whitlow Letter's interpretation of the regulation. Pan Am released Schott from flight duty without firing or disciplining him. Board Op. at 2.

2. If the FAA determined that Simonds had violated FAR § 121.471, under FAA guidelines for flight time violations he could be punished with the suspension of his pilot's license for 15 to 90 days, without pay. *See* Department of Transportation, Federal Aviation Administration Order 2150.3A, Appendix 4, "Enforcement Sanction Guidance Table," II(P).

*Id.* at 3. The FAA brought enforcement actions against Pan Am and the other two crew members, but withdrew the complaints against the crew members because they flew under the threat of losing their jobs. *Id.* at 3.[3] Simonds filed a grievance challenging his termination on January 8, 2001, and ALPA (his union) demanded arbitration. *Id.* at 1.

On January 18, 2001, an organization representing the nation's airline industry brought suit challenging the Whitlow Letter. *See Air Transport Ass'n of America v. Federal Aviation Administration,* Nos. 01–1027, 01–1303 and 01–1306 (D.C.Cir., filed January 18, 2001). Meanwhile, the Arbitration Board held a two-day hearing on Simonds's grievance on July 19 and July 20, 2001. On September 5, 2001, the Court of Appeals granted a stay of enforcement of the Whitlow Letter and its interpretation of FAR § 121.471 pending the Court's determination of its legality. *See* Pan Am Motion, Ex. H. Subsequently, on May 31, 2002, the Court of Appeals resolved that action, upholding the FAA's interpretation of FAR § 121.471 as set out in the Whitlow Letter. The Court concluded that the Whitlow Letter and the FAA's subsequent enforcement policy constituted a reasonable interpretation of FAR § 121.471 and did not require notice-and-comment rulemaking under the APA. *Air Transport Ass'n of America v. FAA,* 291 F.3d 49 (D.C.Cir.2002).[4]

On September 17, 2001, the Arbitration Board, by a vote of 2–1, sustained Captain Simonds's grievance, and determined that Pan Am did not have "just cause" to terminate him for insubordination. Board Op.

at 8–9. The Board quoted three "pertinent contractual provisions" of the collective bargaining agreement: the "management rights" provision in Section 1.C, the "discipline and discharge" or "just cause" provision in Section 19.A, and the provision governing pilot hours of service set forth in Section 12.A:

1. A pilot will not be scheduled or rescheduled for more than fourteen (14) hours of duty between rest periods.

2. If permitted by applicable FAR's, the limitations of subsection A.1 above can be extended to eighteen (18) hours if a series of flights normally scheduled within the fourteen (14) hour limit exceeds the planned duty time because of weather or mechanical delays.

In the Board's view, Pan Am saw this as a "simple case of insubordination" in which Simonds "willfully refused a direct order from his supervisor, even after being told that the Company disputed the Whitlow Letter and that the legitimacy of the new interpretation was unsettled." Board Op. at 5. Pan Am argued that it had a "contractual right to manage and direct its pilots, which is what it did on January 3, 2001" when it terminated Simonds for refusing to fly. *Id.* ALPA, on the other hand, maintained that "the Company's order to [Simonds] was illegal because it conflicted with the FAA's interpretation of the controlling FAR." *Id.* ALPA contended that Simonds acted in good faith, and that termination was "too severe for a long-term employee with an exemplary record." *Id.* Pan Am countered that a pilot is only justified in refusing an order from a superior "when the pilot believes a flight would

---

3. At the time of the Arbitration Board's ruling, the FAA's enforcement action was pending against Pan Am, and the FAA continued to maintain that Pan Am was bound by the FAA's interpretation of FAR § 121.471 as laid out in the Whitlow Letter. Board Op. at 3.

4. In upholding the FAA's interpretation, the Court also concluded that "we do not believe the Whitlow Letter 'significantly revises' a previous 'definitive interpretation' of FAR § 121.471." *Id.* at p. 8.

be unsafe," and that Simonds was required to fly the last leg and then file a grievance, in accordance with the long-recognized "obey now, grieve later" labor rule. *Id.* ALPA responded that an "illegality" exception to this rule applied because Simonds reasonably believed that accepting the flight duty would violate the FAA's interpretation of the FAR set forth in the Whitlow Letter. *Id.*

The Board rejected Pan Am's arguments, concluded that an illegality exception to the "obey now, grieve later" rule applied in this instance, and found that Simonds had acted in good faith and reasonable reliance on the Whitlow Letter interpretation of the FAR. *Id.* at 8–9. Consequently, the Board applied Section 19 of the Agreement to hold that Pan Am did not have "just cause" to terminate Simonds. *Id.*

Pan Am had also argued that the Board should defer the hearing until the courts could resolve the legality of the Whitlow Letter interpretation of the FAR. The Board found, however, that was not the issue the parties brought to arbitration:

> That argument mistakes the ultimate issue in this case. If the question before the System Board was whether [Simonds] was right or wrong in his interpretation of the FAR, we would, of course, have to wait until the final court decision on the pending cases. That is not the issue posed by the parties. Rather, we are to determine whether the Company had just cause to terminate [Simonds]—quite a different matter. The Board can resolve that issue without deciding the proper meaning of the FAR.

*Id.* at 5. The Board determined instead that this case turns on "the applicability of an exception to a fundamental principle of labor arbitration." *Id.* at 6. Adopting the illegality exception, the Board reasoned that "no employee should be punished for disobeying an order that is illegal, unethical, or immoral, or that would endanger the employee or others," and hence "a pilot's good faith and reasonable belief" that a flight would violate a regulation provides a valid exception to the usual "obey now, grieve later" rule. *Id.* at 6, 8.[5]

> Whether Whitlow was right or wrong, he clearly stated the FAA's considered interpretation that the FAR barred a captain from beginning a flight if he knew the trip would carry him past his 16–hour limit. The Grievant's reliance on that apparently authoritative interpretation was therefore not unreasonable.

> Did the Grievant have any other way to escape his dilemma? The Company suggested none and we can think of none.... As he reasonably saw the situation, he had to grasp one horn or the other—risk losing his [pilot's] certificate or risk losing his job.

*Id.* at 8–9. The Board awarded reinstatement, back pay, and interest on the back pay. *Id.* at 9–10.

Pan Am seeks to vacate the Board's award because it does not derive from the essence of the collective bargaining agreement and violates public policy, while ALPA seeks to enforce the award. Both parties have indicated that these consolidated cases need to be resolved even after the decision of the Court of Appeals upholding the Whitlow Letter interpretation of FAR § 121.471.

---

**5.** The Board noted that "the illegality exception does not require that the employee's interpretation be the one the courts eventually approve. That would require pilots to carry a crystal ball with them in the cockpit, and would force them to gamble their jobs on decisions to be made by others long afterward." *Id.* at 8.

18

## SCOPE OF JUDICIAL REVIEW

■ Under the Railway Labor Act (which applies to air carriers like Pan Am as well as rail carriers), an employee or the carrier may file a petition in an appropriate United States District Court to affirm or vacate an award of an arbitration board created pursuant to a collective bargaining agreement between the employee's union and the employer. *See* 45 U.S.C. §§ 181–188. Given the long-standing federal policy favoring resolution of labor disputes through the arbitration process, the Supreme Court has afforded great deference to labor arbitration. As a result, a district court's authority to review labor arbitration awards is extremely limited under the Railway Labor Act, yielding to the parties' intent to be bound by the arbitrator's interpretation and construction of their collective bargaining agreement. "[T]he Court made clear almost 30 years ago that the courts play only a limited role when asked to review the decision of an arbitrator.... The federal policy of settling labor disputes by arbitration would be undermined if courts had the final say on the merits of the awards." *United Paperworkers Int'l Union, AFL–CIO v. Misco, Inc.,* 484 U.S. 29, 36, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987). As the Court more recently added, "courts will set aside the arbitrator's interpretation of what their agreement means only in rare instances." *Eastern Associated Coal Corp. v. United Mine Workers of America,* 531 U.S. 57, 62, 121 S.Ct. 462, 148 L.Ed.2d 354 (2000).

■ There are very few instances in which a court may overturn an arbitrator's award. "[C]ourts are not authorized to reconsider the merits of an award even though the parties may allege that the award rests on errors of fact or on misinterpretation of the contract.... As long as the arbitrator's award 'draws its essence from the collective bargaining agreement,'

and is not merely 'his own brand of industrial justice,' the award is legitimate." *Misco,* 484 U.S. at 36, 108 S.Ct. 364 (quoting *Steelworkers v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 596, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960)). Indeed, "as long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision." *Misco,* 484 U.S. at 38, 108 S.Ct. 364. "This standard has been described as amongst the narrowest known to the law." *Northwest Airlines v. ALPA,* 808 F.2d 76, 80 (D.C.Cir.1987).

■ A court is required to enforce an arbitration award and "[t]his remains so even when the basis for the arbitrator's decision may be ambiguous." *W.R. Grace & Co. v. Local Union 759, Int'l Union of United Rubber Workers,* 461 U.S. 757, 764, 103 S.Ct. 2177, 76 L.Ed.2d 298 (1983). Although the arbitrator may not ignore plain contract language, a court cannot reject an award based on an arbitrator's misreading of the contract. *Misco,* 484 U.S. at 38, 108 S.Ct. 364. A reviewing court's role is "strictly limited to determining whether the arbitrator exceeded his or her authority under the [collective bargaining] agreement. The court is not to concern itself with whether the arbitrator resolved the issue correctly." *Am. Postal Workers Union v. United States Postal Service,* 789 F.2d 1, 5 (D.C.Cir.1986).

## ANALYSIS

Under this exceedingly narrow standard of judicial review, Pan Am seeks to vacate the Arbitration Board's award on two grounds. First, Pan Am contends that the award is not drawn from the essence of the parties' contractual agreement, and that the Board's reliance on the "illegality" exception involved sources outside the collec-

tive bargaining agreement. Second, Pan Am asserts that enforcement of the award will be contrary to public policy. Neither ground is a sufficient basis to disturb the Board's award in light of the severely limited role of the courts.

## I. *Drawn from the Essence of the Agreement*

■ Clearly, the Arbitration Board's decision was "drawn from the essence" of the Agreement. The Board explicitly laid out and quoted the three relevant provisions of the Agreement at issue. Board Op. at 4. The Board specifically construed the "just cause" provision of Section 19.A and found that Pan Am's termination of Simonds was not made with just cause, given the illegality exception to the obey now, grieve later rule. *Id.* at 8–9. In adopting ALPA's recommended construction, the Board rejected Pan Am's assertion that the "management rights" provision controlled, and rejected Pan Am's argument that there was no recognized illegality exception to the obey now, grieve later labor rule that Pan Am had itself cited. *Id.* at 8.

A federal court does not have authority to adopt a different interpretation or choose a competing construction from that of the arbitrator: "It is precisely this type of judicial selection between competing contract interpretations which is foreclosed by the mandate of *Enterprise Wheel.*" *Am. Postal Workers Union,* 789 F.2d at 6. Simply because the Board found the just cause provision to control its ultimate conclusion—as opposed to the management rights provision—does not mean that the Board's ruling was not drawn from the essence of the Agreement. The Board rejected Pan Am's recommended construction that the "management rights" provision gave the company unfettered authority to control its pilots. Board Op. at 7–8. Indeed, the management rights provision

is specifically limited by its own wording, since Pan Am retains authority to manage its pilots "[e]xcept as expressly restricted by this Agreement." Agreement, Section 1.C. The "just cause" provision in Section 19.A is not similarly limited, and the Arbitration Board found it controlling. This Court cannot re-interpret the Agreement to reach Pan Am's preferred interpretation, as the parties here agreed to be bound by the Board's construction of the Agreement. "It is the arbitrator's construction which was bargained for; and so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation of the contract is different from his." *Enterprise Wheel,* 363 U.S. at 599, 80 S.Ct. 1358.

## II. *The Illegality Exception*

Pan Am maintains that the Arbitration Board looked beyond the Agreement itself and "engrafted" the illegality exception onto the obey now, grieve later rule, and thus imposed its own "notion of industrial justice" drawn from sources outside of the Agreement. *See* Pan Am's Points and Authorities at 12. However, the Supreme Court has repeatedly made clear that arbitrators are not bound strictly by the specific terms of a collective bargaining agreement:

> This Court has observed: "A collective bargaining agreement is not an ordinary contract for the purchase of goods and services, nor is it governed by the same old common-law concepts which control such private contracts. [I]t is a generalized code to govern a myriad of cases which the draftsmen cannot wholly anticipate. The collective bargaining agreement covers the whole employment relationship. It calls into being a new common law-the common law of a particular industry or of a particular plant."

*Consol. Rail Corp. v. Ry. Labor Executives' Assoc.*, 491 U.S. 299, 311–312, 109 S.Ct. 2477, 105 L.Ed.2d 250 (1989) (quoting *Transp.-Communication Employees Union v. Union Pacific R.R. Co.*, 385 U.S. 157, 160–161, 87 S.Ct. 369, 17 L.Ed.2d 264 (1966)).

Here, the Board construed the just cause clause of the Agreement, a vague provision that does not define, reference or limit the meaning of "just cause." Pan Am argued that it had just cause to terminate Simonds because he was obligated to comply with the obey now, grieve later rule—in other words, file a grievance only *after* completing the flight. The Board agreed with Pan Am at the outset that the obey now, grieve later rule was applicable:

> Ultimately, this case turns on ... the applicability of an exception to a fundamental principle of labor arbitration. The normal rule is that an employee who believes an order to be improper should "obey now and grieve later." The rationale for the rule is obvious and universally accepted: it would be impossible to operate a business if every employee could refuse any [order] he or she deemed improper.

Board Op. at 6. The Board added, however, that arbitrators have created certain exceptions to the rule to avoid "unacceptable consequences." *Id.* The Board stated that "[a] standard reference work in the field provides a concise statement of the rule, its exceptions, and the qualifications to the exceptions," including an exception that "an employee need not obey an order or rule if he or she ... reasonably believes it to be illegal, unethical, or immoral." *Id.* (citing *The Common Law of the Workplace: The Views of Arbitrators*, 175–176

(Theodore J. St. Antoine ed., BNA Books 1998)).[6] The Board explained the narrow circumstances in which the exception applies, and rejected Pan Am's contention that the exception did not exist in the industry. Board Op. at 7. The Board analyzed five published arbitration decisions cited by Pan Am to support its position that there is no recognized illegality exception, finding that one was irrelevant and that four "involve the safety exception to the general [obey now, grieve later] rule; they do not even refer to the illegality exception, let alone reject it." *Id.* The Board then reasoned:

> Citing four cases on [the safety] exception hardly proves that other exceptions do not exist. The Union's brief (at 11–12), in contrast, cites six cases recognizing and applying the illegality exception. A party cannot dispose of a widely-recognized rule simply by a bald assertion that it does not exist. Moreover, the cases cited by the Company all turn on other issues.

*Id.* "In sum," the Board concluded, "the Company failed to provide any evidence or authority that the illegality exception to the general rule does not or should not apply in this industry." *Id.* at 8.

██ Pan Am maintains that the Board created the illegality exception out of whole cloth and "engrafted" it onto the Agreement. Of course, this exception relates to the obey now, grieve later rule on which Pan Am relied, and that maxim is *itself* not explicitly drawn from the Agreement. Rather, the rule is a long-recognized and commonly understood maxim within the industrial common law of labor arbitration. Hence, both the rule and the

---

**6.** The Board added that "[o]ther major works on labor arbitration recognize the same rule and exceptions." Board Op. at 6 (citing Elkouri & Elkouri, *How Arbitration Works*, 283– 285 (BNA Books 5th ed.1997), and *Discipline and Discharge in Arbitration*, 156–166 (Norman Brand ed., BNA Books 1998)).

exception come from the same source—the common law of labor arbitration.

Pan Am has suggested that the obey now, grieve later principle is implicit within the general body of grievance procedures in Section 20 of the Agreement, or within the procedures for discharge in Section 19 of the Agreement. But there is no language within either of these sections that states the obey now, grieve later rule, and Pan Am has not referenced any provision that establishes such a rule. Rather, Pan Am simply states that the Agreement "embodies the fundamental principle of labor relations, known as the 'obey now, grieve later' rule." Pan Am Complaint at ¶ 6. To be sure, the Arbitration Board also characterized the rule as "a fundamental principle of labor arbitration." Board Op. at 6. Yet, like the illegality exception the Board applied, this rule is not an explicit provision within the Agreement itself.

Pan Am also argued at arbitration that the only recognized exception to the obey now, grieve later rule is for safety—a defense that would allow a pilot to refuse a company's order to fly if the pilot believes, in good faith, that it would be unsafe. Board Op. at 5. This safety exception, like the obey now, grieve later rule and the disputed illegality exception, is not set out in the Agreement. Pan Am, however, conceded at arbitration that the safety exception existed. Apparently, in an appropriate situation Pan Am would agree that the application of a safety exception to the obey now, grieve later rule is proper. The only question here, then, is whether an illegality exception also is recognized in the relevant industry common law—if it is, then its application would be no more of an impermissible supplementation of the Agreement.

■ Essentially, Pan Am asks this Court to revisit the Arbitration Board's interpretation of the industry common law—a common law which Pan Am concedes properly *supplements* the collective bargaining agreement, at least in the situation of an unsafe plane. *See* Board Op. at 5; *see also Am. Postal Workers Union,* 789 F.2d at 5 (a collective bargaining agreement "is supplemented by the 'common law of a particular industry or of a particular plant' ") (quoting *United Steelworkers v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 579, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960)). Arbitrators cannot ignore specific language within a collective bargaining agreement, but they have long had authority to look beyond vague provisions to determine the custom, common law, and practice within an industry in order to better inform their interpretations and constructions of agreements. *See Transp.-Communications Employees Union,* 385 U.S. at 161, 87 S.Ct. 369. "The labor arbitrator's source of law is not confined to the express provisions of the contract, as the industrial common law—the practices of the industry and the shop—is equally a part of the collective bargaining agreement although not expressed in it." *Warrior Gulf & Navigation,* 363 U.S. at 581, 80 S.Ct. 1347. Here, the Board surveyed the industry common law and reviewed other arbitration decisions applying just cause provisions, and concluded that precedent recognizes an illegality exception to the obey now, grieve later rule in the present circumstances. The Board was well within its authority in doing so.

■ The parties to a collective bargaining agreement have agreed to abide by the arbitrator's construction of the relevant industry common law. *See, e.g., Air Line Pilots Assoc. v. Eastern Air Lines, Inc.,* 869 F.2d 1518, 1522 (D.C.Cir.1989) ("Construing the 'common law of a particular industry' is a question of contract interpretation within the expertise and authority of an arbitrator, not the court.");

*Burlington Northern, Inc. v. Am. Ry. Supervisors Assoc.,* 527 F.2d 216, 220 (7th Cir.1975) ("When the parties disagree, the Adjustment Board is charged with interpreting this [industry or plant] 'common law.'"). Here, the Board cited several respected treatises on arbitration law to support its conclusion that the illegality exception tempered the obey now, grieve later rule. *See* Board Op. at 6. Hence, the Board did not impose its "own notion of industrial justice," but rather surveyed and utilized applicable common law from other arbitration decisions and learned treatises. The parties bargained for the Board to construe not only the Agreement but also the common law of the industry that supplements it. "It is the arbitrator's construction which was bargained for; and so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation of the contract is different from his." *Enterprise Wheel,* 363 U.S. at 599, 80 S.Ct. 1358. Arbitrators often look to related arbitration decisions in an effort to construe similar provisions of a collective bargaining agreement. As the Supreme Court has stated, "[i]n order to interpret such an agreement it is necessary to consider the scope of other related collective bargaining agreements, as well as the practice, usage and custom to all such agreements." *Transp.–Communication Employees Union,* 385 U.S. at 161, 87 S.Ct. 369; *see also Misco,* 484 U.S. at 39–40, 108 S.Ct. 364 ("[a]s the arbitrator noted, this approach was consistent with the practice followed by other arbitrators"); *see also Enterprise Wheel,* 363 U.S. at 597, 80 S.Ct. 1358 (in construing agreement, arbitrator may look for guidance from many sources).

Pan Am nonetheless argues that the Agreement here "has no clause authorizing the arbitrator to use or apply external laws, set forth in external treatises or labor arbitration precedent." Pan Am Reply at 4. But arbitration decisions incorporating common law from external sources into a collective bargaining agreement are routinely upheld, on the basis that arbitrators have the authority to determine the common law of the industry that supplements an agreement. *See, e.g., Bhd. of Maint. of Way Employees v. Atchison, Topeka & Santa Fe Ry. Co.,* 138 F.3d 635, 640 (7th Cir.1997) (sources of meaning beyond the agreement can be incorporated); *NCR Corp. v. Int'l Assoc. of Machinists and Aerospace Workers,* 906 F.2d 1499, 1500 & n. 3 (10th Cir.1990) (arbitrator looked to "a number of published arbitration, NLRB, and judicial decisions" in order to "help interpret ambiguities in [collective bargaining agreement] language"); *Folger Coffee Co. v. Int'l Union,* 905 F.2d 108, 111 (5th Cir.1990) (upholding arbitration panel's ruling relying on treatise to limit a collective bargaining agreement provision); *Conoco, Inc. v. Oil, Chemical & Atomic Workers Int'l Union,* 26 F.Supp.2d 1310, 1316–1317 (N.D.Okla. 1998) (upholding arbitrator's reliance on arbitration decision to construe "just cause" provision).

The Board analyzed the body of arbitration decisions in an effort to inform itself and illuminate the contours of the just cause provision. In other words, in construing that provision with the aid of its interpretation of the common law, the Board's ruling is, in effect, "drawn from the essence" of the Agreement. *See Enterprise Wheel,* 363 U.S. at 597, 80 S.Ct. 1358. "[A]s long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision." *Misco,* 484 U.S. at 38, 108 S.Ct. 364. Hence, the Board was within its authority to look beyond the

Agreement and incorporate its interpretation of the common law of the industry in construing the Agreement. Accordingly, under the limited scope of review available, this Court cannot disturb the Board's conclusion that an illegality exception to the obey now, grieve later rule applied to Captain Simonds's conduct.

### III. *Public Policy*

 To violate public policy, an arbitration award must "run contrary to an explicit, well-defined, and dominant public policy, as ascertained by reference to positive law and not from general considerations of supposed public interests." *Eastern Associated Coal Corp.*, 531 U.S. at 62, 121 S.Ct. 462 (citations omitted). This public policy doctrine "applies only when the public policy emanates from clear statutory or case law," and represents an exception to the general deference to arbitration that is "extremely narrow." *Northwest Airlines*, 808 F.2d at 78, 83. It is not the underlying conduct of an employee that is at issue; rather, the arbitration award itself—e.g., reinstatement to a former position—cannot violate public policy. *Eastern Associated Coal Corp.*, 531 U.S. at 62–63, 121 S.Ct. 462 ("[O]f course, the question to be answered is not whether Smith's drug use itself violates public policy, but whether the agreement to reinstate him does so.").

 As the Supreme Court has reiterated, the public policy must be "explicit," as in a "specific provision of any law or regulation." *Id.* at 66, 121 S.Ct. 462. In support of its public policy claim, Pan Am has cited 49 U.S.C. § 41702, which states

only the general policy that "[a]n air carrier shall provide safe and adequate interstate air transportation." At oral argument, counsel for Pan Am for the first time relied on other legislation and regulations which require airlines to ensure timely service for passengers, prevent delays, and reimburse delayed passengers for hotels and meals, and also cited the overarching policy of the Railway Labor Act— to prevent interruptions in rail and air service due to industry strikes. Pan Am's contention is that reinstating Simonds will only encourage other rogue pilots to disobey orders, thereby possibly leaving more passengers stranded or delayed.

None of these purported public policy standards are specific, explicit, or well-defined in statute or regulation. Indeed, although Pan Am points to a "specific" statute enacted at 49 U.S.C. § 41702, the reinstatement of Captain Simonds would not violate this statute, which merely requires "safe and adequate interstate air transportation." The policy embodied in this statute is exactly the kind of "general consideration of supposed public interests" that the Supreme Court has found to be too broad and generalized to invoke. Likewise, the regulations cited by Pan Am requiring timely service, the prevention of delays, and passenger reimbursement do not amount to a "dominant" or "explicit" policy that Simonds's reinstatement would violate. And certainly Pan Am has not cited any specific provision within the Railway Labor Act that the reinstatement of Captain Simonds would violate, relying instead only on the broad purpose of the legislation.[7] Although Congress and the

---

7. Following the ruling by the D.C. Circuit upholding the Whitlow Letter, this Court ordered the parties to indicate what impact, if any, that ruling had on their claims. Pan Am used that opportunity to recite additional statutes and argument in an attempt to cement its public policy position. These additional cited statutes are just as vague and non-specific as are Pan Am's previous references. Pan Am reiterates the claim that the general policy underlying the Railway Labor Act—to avoid interruption in rail or air service—would be

FAA have detailed an extensive statutory and regulatory framework to ensure safe airline travel, Pan Am has not referenced particular provisions within that framework that would be violated by the reinstatement of Captain Simonds. *See Eastern Associated Coal Corp.*, 531 U.S. at 63, 121 S.Ct. 462 ("[W]here two political branches have created a detailed regulatory regime in a specific field, courts should approach with particular caution pleas to divine further public policy in that area."). Indeed, Captain Simonds's reinstatement is *consistent with* the FAA's current interpretation of FAR § 121.471, which has now been upheld by the D.C. Circuit. *See Eastern Associated Coal Corp.*, 531 U.S. at 66, 121 S.Ct. 462 (finding no public policy violation, noting that the arbitrator's ruling was "consistent with DOT rules").[8] Pan Am has identified no statute, regulation, or other law to which implementation of the Board's award "runs contrary." *Id.* (quoting *Misco*, 484 U.S. at 43, 108 S.Ct. 364).

## CONCLUSION

The Court concludes that the Arbitration Board's award is drawn from the essence of the collective bargaining agreement between Pan Am and ALPA, and that the Board did not act beyond its authority in construing and applying the common law of the industry to the parties' Agreement. The Court further concludes that the Board's award requiring the reinstatement of Captain Simonds does not violate public policy. Accordingly, in light of the extremely limited scope of this Court's review, Pan Am's motion to vacate the arbitration award is denied and ALPA's motion for summary judgment is granted.[9] A separate order will be issued.

## ORDER

Upon consideration of Air Line Pilots Association's (ALPA) Motion to Dismiss

---

violated by the reinstatement of Simonds. But the *reinstatement* of Simonds does not delay or interrupt service in any way. *See Eastern Associated Coal Corp.*, 531 U.S. at 62–63, 121 S.Ct. 462. Moreover, the mere chance that Simonds's reinstatement will encourage other pilots to resort to self-help, as Pan Am argues, is far too speculative to amount to an actual violation of public policy. To overturn the decision of an arbitration board on the basis of public policy, there must be an actual violation of the policy, not some hypothetical possibility of a future violation. Hence, even allowing Pan Am's eleventh-hour addition of authority, Pan Am has not established a violation of public policy.

8. The Court of Appeals, in upholding the FAA's interpretation in the Whitlow Letter, noted that the Federal Aviation Act directs the FAA to "promote safe flight of civil aircraft," and stated that the "protection against acute short-term fatigue of crewmembers was also one of the FAA's goals." *Air Transport Ass'n of America*, 291 F.3d at 51–52.

9. ALPA has also requested that the Court order Pan Am to pay ALPA's attorney's fees, citing 45 U.S.C. § 153(p) as the statutory basis for such an award. However, that section applies only to railroads, as this particular provision of the Railway Labor Act is specifically exempted from the amendments that included airlines under the Act. *See* 45 U.S.C. § 181 ("All of the provisions of subchapter I of this chapter, **except section 153 of this title**, are extended to and shall cover every common carrier by air engaged in interstate or foreign commerce ...") (emphasis added); *see also Air Line Pilots Ass'n Int'l v. Northwest Airlines, Inc.*, 415 F.2d 493 (8th Cir.1969); *Northwest Airlines, Inc. v. Air Line Pilots Ass'n Int'l*, 385 F.Supp. 634, 640 (D.D.C.1974); *Texas Int'l Airlines, Inc. v. Assoc. of Flight Attendants*, 498 F.Supp. 437, 449 (S.D.Tex. 1980), *aff'd*, 667 F.2d 1169 (5th Cir.1982); *Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen and Helpers of America v. Pan Am World Services, Inc.*, 686 F.Supp. 888, 889 (M.D.Fla.1988); *cf. Assoc. of Flight Attendants v. Horizon Air Industries*, 976 F.2d 541, 551 (9th Cir.1992). Without any other statutory basis for an award of attorney's fees, or any contract provision in the collective bargaining agreement, the Court denies ALPA's request for attorney's fees.

and for Summary Judgment and Pan American Airways's Cross Motion for Summary Judgment, the memoranda and supporting materials of the parties, and oral argument of counsel, and the entire record herein, it is hereby

ORDERED that ALPA's Motion to Dismiss and for Summary Judgment be and hereby is GRANTED. Judgment is entered in favor of ALPA as a matter of law on Pan American Airways's petition to set aside the Arbitration Board award and ALPA's petition to enforce the award. Pan American Airways's Cross Motion for Summary Judgment is accordingly hereby DENIED. ALPA's request for attorney's fees and costs is hereby DENIED.

A memorandum opinion explaining these rulings has been issued on this date.