

1995 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-15-1995

# Sammon v NJ Bd Medical Exam

Precedential or Non-Precedential:

Docket 94-5495

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1995

## Recommended Citation

"Sammon v NJ Bd Medical Exam" (1995). *1995 Decisions.* Paper 254.
http://digitalcommons.law.villanova.edu/thirdcircuit_1995/254

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1995 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NO. 94-5495


ALICE SAMMON; MICHAEL and STEFANIA SANTOMENNA; TRACY LEAL
and TOM QUINN, TONY and VICKI DIIOIA and LANDIE SIMONE,

Appellants

v.

NEW JERSEY BOARD OF MEDICAL EXAMINERS; STATE OF NEW JERSEY,
CHRISTINE TODD WHITMAN, GOVERNOR, STATE OF NEW JERSEY

(Caption amended per the Clerk's 9/26/94 order)



Appeal from the United States District Court
For the District of New Jersey
(D.C. Civil No. 94-cv-00958)



Argued February 17, 1995


BEFORE:  STAPLETON and COWEN, Circuit Judges, and
         HUYETT, District Judge*

(Opinion filed September 15, 1995)



                    Michael H. Sussman (Argued)
                    Law Offices of Michael H. Sussman
                    25 Main Street
                    Goshen, NY  10924

                    John P. Brennan, Jr.
                    912 Wall Road
                    Spring Lake Heights, NJ  07762

                    Attorneys for Appellants

* Honorable Daniel H. Huyett, 3rd, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

Deborah T. Poritz
Attorney General of New Jersey
Andrea M. Silkowitz
Assistant Attorney General
Sandra Y. Dick (Argued)
Senior Deputy Attorney General
Office of Attorney General of
 New Jersey
124 Halsey Street
P.O. Box 45029
Newark, NJ  07101

               Attorneys for Appellees

OPINION OF THE COURT

STAPLETON, Circuit Judge:

This case presents a substantive due process challenge to several provisions of a New Jersey licensing statute regulating the practice of midwifery.  The plaintiffs/appellants are several aspiring midwives, a midwife not presently licensed by the State of New Jersey, and several couples who wish to employ a midwife to assist with the birth of their next child. We hold that the New Jersey statute passes constitutional muster.

I.

A person is "regarded as practicing midwifery" under New Jersey's statute if he or she "attends a woman in childbirth as a midwife, or advertises as such."[0]  N.J. Stat. Ann.

---

[0]  The definition section of the statute stipulates that it does not apply to "gratuitous service in case of emergency" or to "the service of any legally qualified physician or surgeon."

§ 45:10-1.  Persons wishing to practice midwifery in New Jersey first must obtain a midwifery license from the state board of medical examiners.  N.J. Stat. Ann. § 45:10-2.  Candidates for a license must pass an examination designed "to test the scientific and practical fitness of candidates to practice midwifery," N.J. Stat. Ann. § 45:10-5,[0] and must complete an application

---

[0]  Section 45:10-5 provides:

> The examination may be oral or written, or both, and shall be in the English language and shall be held on the following subjects:
>
> a.  Anatomy of the pelvis and female generative organs.
>
> b.  Physiology of menstruation.
>
> c.  Diagnosis and management of pregnancy.
>
> d.  Diagnosis of foetal presentation and position.
>
> e.  Mechanism and management of normal labor.
>
> f.  Management of the puerperium.
>
> g.  Injuries to the genital organs following labor.
>
> h.  Sepsis and antisepsis in relation to labor.
>
> i.  Special care of the bed and lying-room.
>
> j.  Hygiene of the mother and infant.
>
> k.  Asphyxiation, convulsions, malformation and infectious diseases of the newborn.
>
> l.  Cause and effects of ophthalmia neonatorum.
>
> m.  Abnormal condition requiring attendance of a physician.

evidencing, inter alia, that they are of good moral character, and that they have "received a certificate or diploma from a legally incorporated school of midwifery, or maternity hospital, in good standing . . ., after at least eighteen hundred hours' instruction within a period of not less than nine months."  N.J. Stat. Ann. § 45:10-3.[0]  Candidates also must get a physician registered in the State of New Jersey to indorse their application.  Id.

Appellant Alice Sammon, though not licensed in New Jersey, has a nursing degree from a certified nursing school and substantial apprenticeship training as a midwife.  She has assisted in several hundred births and is registered as a midwife with the North American Registry of Midwives.  Appellants Michael and Stefania Santomenna, Tracy Leal and Tom Quinn, and Tony and Vicki DiIoia (the "parents") are couples who plan to expand their families and desire to employ midwives to assist them with home births.  Appellants Vicki DiIoia, Leal, and Landi Simone (the "aspiring midwives") intend, if permitted, to pursue careers as midwives in New Jersey.

---

> The examination shall be sufficient to test the scientific and practical fitness of candidates to practice midwifery, and the board may require examination on other subjects relating to midwifery from time to time.

[0]  The statute provides that in lieu of such a diploma, the candidate may provide "a certificate or diploma from a foreign institution of midwifery of equal requirements as determined by the board, conferring the full right to practice midwifery in the country in which it was issued."  N.J. Stat. Ann. § 45:10-3.

Appellants filed suit under 42 U.S.C. § 1983 against the New Jersey Board of Medical Examiners and Governor Christine Todd Whitman, claiming that the licensing scheme violates their due process rights under the Fourteenth Amendment. They sought injunctive relief against enforcement of the statute. The district court granted the defendants' motion to dismiss and appellants filed this timely appeal.

## II.

### A.

The district court ruled that the aspiring midwives lacked standing to challenge the New Jersey statutory scheme because they had "made only wholly conclusory allegations that they aspire to become midwives," and had not alleged that they had "approached physicians and been denied sponsorship, or attempted to enroll in any one of thirty out of state mid-wife schools, or applied for a license to be a midwife, or sought out a registered maternity hospital." (Dist. Ct. Op. at 6.)

The Supreme Court has held that "when standing is challenged on the basis of the pleadings, [courts must] 'accept as true all material allegations of the complaint, and . . . construe the complaint in favor of the complaining party.'" Pennell v. San Jose, 485 U.S. 1, 7 (1988) (quoting Warth v. Seldin, 422 U.S. 490, 501 (1975)); see generally Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992). Accordingly, for purposes of deciding the issue of standing at this stage of the case, we must accept as true the aspiring midwives' claims

(1) that they sincerely desire to become midwives, (2) that the 1800 hours of study and the physician-indorsement requirements "inhibit" them from taking steps necessary to become midwives, and (3) that "but for" the New Jersey statutory scheme, they would be able to become midwives and practice their chosen profession.

To establish standing, the aspiring midwives must meet the following requirements:

> First, [they] must have suffered "an injury in fact" -- an invasion of a legally protected interest which is (a) concrete and particularized, and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'"
>
> Second, there must be a causal connection between the injury and the conduct complained of -- the injury has to be "fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court."
>
> Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

Lujan, 504 U.S. at 560-61 (citations omitted); see also Erwin Chemerinsky, Federal Jurisdiction §2.3, at 51 (1989).

The second and third Lujan factors are clearly present here.  As noted, the aspiring midwives allege that but for the 1800-hour study and the physician-indorsement requirements, they would become licensed midwives.  Thus, the alleged injury -- not being able to practice their chosen profession -- is both fairly traceable to New Jersey's statutory scheme and likely to be

redressed by a favorable decision ruling that scheme unconstitutional.

The allegations also suffice to establish an "injury in fact." First, the aspiring midwives' assertion of a right to practice their chosen profession is a legally cognizable one. See Hampton v. Mow Sun Wong, 426 U.S. 88, 102 n.23 (1976). Second, their injuries are "concrete and particularized" because the statutory requirements, by making it more difficult for the aspiring midwives to practice their chosen profession, affect each aspiring midwife in a "personal and individual way." Lujan, 504 U.S. at 560 n.1. Finally, the injuries are "actual or imminent" and not "conjectural" or "hypothetical" because the aspiring midwives allege present sincere desires to work as midwives and claim that the New Jersey statutory scheme has deterred them from taking any steps towards reaching their goals.

That the aspiring midwives may not presently have the training necessary to work as midwives does not defeat their standing to challenge the New Jersey scheme. We recognize that the existence of factual contingencies which stand between a litigant and her goal may at times defeat her standing to challenge a particular statutory barrier to reaching that same goal. See, e.g., Roe v. Wade, 410 U.S. 113, 127-28 (1973) ("married couple" plaintiffs did not have standing to challenge Texas' abortion statute because the married woman was not pregnant and her "alleged injury" rested "on possible future contraceptive failure" that she intended to do her best to avoid); see also Warth v. Seldin, 422 U.S. 490, 502-08 (1975)

(low-income plaintiffs had no standing to challenge a zoning ordinance because their ability to move into the zoned area "depended on the efforts and willingness of third parties to build low- and moderate-cost housing").  The aspiring midwives' claims are not based upon uncertain events, however.  While they do not presently have the training to function as midwives, the aspiring midwives allege both a present desire to become midwives and that the New Jersey statutory scheme -- including the training requirement -- is the only thing that prevents them from reaching that goal.

Nor is our analysis changed by the facts that the aspiring midwives have never applied for midwife licenses or asked physicians for indorsements.  We recognize that a litigant's failure to apply for a license may at times render her challenge to a licensing scheme unripe for judicial review.  See, e.g., Pacific Gas & Elec. Co. v. State Energy Resources Conservation & Dev. Comm'n, 461 U.S. 190, 200-03 (1983).  In many cases, requiring litigants to actually apply for a license before challenging a licensing scheme "'prevent[s] courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also . . . protect[s] the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.'"  Id. at 200 (quoting Abbott Lab. v. Gardner, 387 U.S. 136, 148-49 (1967)). In the case at bar, however, there is no indication that the aspiring midwives possibly could obtain a license or a

physician's indorsement without first going through the 1800 hours of instruction. Requiring these women to apply for a license or to approach physicians asking for indorsements before going through the required training -- as the district court appears to suggest -- accordingly would serve no purpose. Litigants are not required to make such futile gestures to establish ripeness. Hailes v. United Air Lines, 464 F.2d 1006, 1008 (5th Cir. 1972); Image Carrier Corp. v. Beame, 567 F.2d 1197, 1201-02 (2d Cir. 1977), cert. denied, 440 U.S. 979 (1979); see also International Bhd. of Teamsters v. United States, 431 U.S. 324, 365 (1977) ("If an employer should announce his policy of discrimination by a sign reading 'Whites Only' on the hiring-office door, his victims would not be limited to the few who ignored the sign and subjected themselves to personal rebuffs."); compare Newark Branch, NAACP v. Harrison, 907 F.2d 1408, 1415 (3d Cir. 1990) (plaintiff organization's members have no standing to challenge discriminatory employment practice because there was no indication that any of the members was deterred by the practice from applying for a job).[0]

---

[0]  The defendants argue that Sammon's claim is barred by New Jersey's "entire controversy doctrine." Because the district court concluded that the aspiring midwives had no standing, it was required to address that argument before reaching the merits of the plaintiffs' claim that New Jersey's licensing statute violates the substantive due process rights of those who wish to practice midwifery. The district court concluded that Sammon's claim was barred under New Jersey's entire controversy doctrine because she had failed to attack the constitutionality of the statute in a previous prosecution for practicing midwifery in New Jersey without a license. We do not reach this issue whether the complete controversy doctrine applies here because Sammon's complaint, even if consistent with the entire controversy doctrine, does not state a claim under which relief can be

B.

The parents also have standing to assert their claims. While none of the women are presently pregnant, they all have borne children in the past, intend to have additional children, and are determined to employ midwives to assist them with birthing those additional children at home. In the past, the parents all either have travelled out of state to obtain the services of a midwife or have used the services of an unlicensed midwife.

In sum, we conclude that each of the plaintiffs has standing to challenge the constitutionality of the New Jersey statutory scheme regulating the practice of midwifery and that those claims are ripe for adjudication. Accordingly, we proceed to the merits of the appellants' substantive due process challenge.

---

granted and because the claim of the aspiring midwives would require us, in any event, to address the merits of Sammon's substantive due process claim.

III.

The first step in any substantive due process case is to determine the standard of review. "The choice of a standard of review . . . turns on whether a 'fundamental right' is implicated." Planned Parenthood v. Casey, 947 F.2d 682, 688 (3d Cir. 1991). In order to determine what interests of the plaintiffs are at stake here and thus what the appropriate standard of review is, we must look solely to the allegations of the complaint and the provisions of the challenged statute.

Turning first to the statute, it is important to focus on what it does and does not do. The statute regulates who may engage in practicing midwifery in New Jersey. It does not prohibit midwifery. Nor does it regulate where or in what manner birthing may take place. It thus does not foreclose the parents from engaging the services of a midwife or from electing birth at home, natural child birth, or any particular procedure in the course of delivery.[0]

It is similarly important to focus on what the complaint does and does not allege. The complaint alleges that the statute "unconstitutionally deprives plaintiff Sammon of her ability to earn a living at her chosen profession," and the aspiring midwives of "their ability to practice in their respective field of interest." (App. at 25.) With respect to

---

[0] The statute does require that midwives "secure the immediate services of a reputable registered physician whenever any abnormal signs or symptoms appear in either mother or infant." N.J. Stat. Ann. § 45:10-8. Plaintiffs do not challenge this portion of the statute.

the parents, the complaint alleges that the statute "unduly restricts the right of the consumer plaintiffs to choose a birthing style and a qualified attendant of their choice."  (App. at 26.)

The complaint does <u>not</u> allege that there are no licensed midwives or a dearth of licensed midwives in New Jersey.[0]  It does allege that the statute makes it "practically impossible" for <u>certain</u> midwives -- "direct entry midwives" -- to be "licensed and make themselves accessible to consumers like" the parents.  (App. at 26 (emphasis supplied).)  While the complaint thus refers to "direct entry midwives" and to "direct entry midwifery," it gives limited content to these references.  We are told only that direct entry midwives are "a class of providers historically and traditionally recognized in the State of New Jersey," (app. at 24-25), that "[d]irect entry midwifery has been primarily learned through apprenticeships served with practicing midwives, supplemented by relevant book study," (app. at 23-24), that it "is as safe, if not safer, than . . . births attended by physicians in hospitals," (app. at 18), and that it "is [not] identical in approach to the practice of a certified nurse midwife,"[0] <u>id.</u>

---

[0]  Plaintiffs' briefing acknowledges that there are certified nurse midwives licensed to practice midwifery in New Jersey. Certified nurse midwives are individuals who have satisfied the requirement for being a licensed nurse and have had further specialized training in an accredited program in midwifery.
[0]  <u>See</u> n.6, <u>supra</u>.  Plaintiffs' Reply Brief indicates that they will need discovery before they will be able to describe the difference in approach between the practice of midwifery by direct entry midwives and by certified nurse midwives.

Our independent research indicates that "direct entry midwifery" does not have a universally understood meaning.[0] Moreover, our research disclosed no source that used direct entry midwifery to describe a particular manner of practicing midwifery. If plaintiffs' use of the phrase is intended to refer to a manner of practicing, however, New Jersey's statute does not foreclose anyone from obtaining a license to practice, or from practicing, direct entry midwifery so long as that individual meets the qualification specified in the statute.

Based upon the complaint and the statute, it is thus clear that the interests at stake here are the interest of Sammon and the aspiring midwives in practicing midwifery and the interest of the parents in selecting a midwife of their choice. These are not the kind of interests that have been found to be "fundamental" in the context of choosing the appropriate level of review for substantive due process purposes. State restrictions on the right to practice a profession receive rational basis review rather than higher scrutiny.[0] Williamson v. Lee Optical

_____

[0] Direct entry is frequently used to describe a midwife who has received her training solely through an apprenticeship. It is also used as a synonym for a "lay midwife," in the sense of a midwife who is not a licensed nurse or other health professional. Colorado, for example, licenses "direct-entry midwives." It states that they are "also known as 'lay' midwives" and defines "direct-entry midwifery" as the "advising, attending, or assisting of a woman during pregnancy, labor and natural childbirth at home" in accordance with the licensing statute -- i.e., by persons who are authorized under the statute and who do not hold other professional licenses that authorize midwifery. Colo. Rev. Stat. §§ 12-37-101-102.

[0] We thus reject the plaintiffs' contention that fundamental rights are at stake here and that the statute must, accordingly,

of Oklahoma, Inc., 348 U.S. 483 (1955); Schware v. Board of Bar Examiners, 353 U.S. 232, 239 (1957).  Similarly, state restrictions on a patient's choice of particular health care providers are subjected only to rational basis review. Connecticut v. Menillo, 423 U.S. 9 (1975) (state may require that abortions be performed only by licensed physicians, even in the first trimester of pregnancy); Mitchell v. Clayton, 995 F.2d 772, 774 (7th Cir. 1993) (state regulation of acupuncture evaluated under rational basis test); New York State Ophthalmological Soc'y v. Bowen, 854 F.2d 1379 (D.C. Cir. 1988) (state regulation of ophthalmology not entitled to strict scrutiny review); Potts v. Illinois Dept. of Registration and Education, 538 N.E.2d 1140 (Ill. 1989) (state regulation affecting the practice of naprapathy evaluated under rational basis standard); Leigh v. Board of Registration in Nursing, 506 N.E.2d 91 (Mass. 1987) (rejecting claim that regulation of midwifery should be reviewed under higher strict scrutiny standard); Bowland v. Municipal Court, 556 P.2d 1081 (Cal. 1976) (same).[0]

---

receive strict scrutiny.  Where strict scrutiny is required, the state must show that the statute serves a compelling state interest and that the state's objective could not be achieved by a measure less restrictive of the plaintiff's fundamental right. Lutz v. City of York, 899 F.2d 255, 268-69 (3d Cir. 1990).  Thus, if statutes licensing health care professionals were subject to this strict form of scrutiny, states would have to shoulder the burden of demonstrating that no less restrictive set of qualifications for a license could serve the state's interest in protecting the health of its citizens.

[0]  In the absence of extraordinary circumstances, state restrictions on a patient's choice of a particular treatment also have been found to warrant only rational basis review.  See, e.g., Carnohan v. United States, 616 F.2d 1120 (9th Cir. 1980) (laetrile); Rutherford v. United States, 616 F.2d 455 (10th Cir.)

Where rational basis review is appropriate, a statute withstands a substantive due process challenge if the state identifies a legitimate state interest that the legislature rationally could conclude was served by the statute. As we explained in Rogin v. Bensalem Township, 616 F.2d 680 (3d Cir. 1980), cert. denied, 450 U.S. 1029 (1981):

> The test for determining whether a law comports with substantive due process is whether the law is rationally related to a legitimate state interest. "[T]he law need not be in every respect consistent with its aims to be constitutional. It is enough that there is an evil at hand for correction, and that it might be thought that the particular legislative measure was a rational way to correct it."

616 F.2d at 689 (quoting Williamson v. Lee Optical of Oklahoma, Inc., 348 U.S. 483, 487-88 (1955)); see also Midnight Sessions, Ltd. v. City of Philadelphia, 945 F.2d 667, 682 (3d Cir. 1991), cert. denied, 503 U.S. 984 (1992). Determining whether a particular legislative scheme is rationally related to a legitimate governmental interest is a question of law. Id.

We stress that a court engaging in rational basis review is not entitled to second guess the legislature on the factual assumptions or policy considerations underlying the statute. If the legislature has assumed that people will react to the statute in a given way or that it will serve the desired

---

(same), cert. denied, 449 U.S. 937 (1980); Mitchell v. Clayton, 995 F.2d 772 (7th Cir. 1993) (acupuncture). Because the challenged statute does not regulate the manner in which a mother gives birth, we have no occasion to determine the appropriate standard of review for a statute that regulates the manner of birthing.

goal, the court is not authorized to determine whether people have reacted in the way predicted or whether the desired goal has been served.  The sole permitted inquiry is whether the legislature rationally might have believed the predicted reaction would occur or that the desired end would be served.  When legislation is being tested under rational basis review, "those challenging the legislative judgment must convince the court that the legislative facts on which the classification [of the statute] is apparently based could not reasonably be conceived as true by the governmental decisionmaker."  Vance v. Bradley, 440 U.S. 93, 111 (1979); see also Pace Resources, Inc. v. Shrewsbury Township, 808 F.2d 1023, 1034-35 (3d Cir.), cert. denied, 482 U.S. 906 (1987).  Thus, New Jersey's classification of what it takes to provide assurance of acceptable quality services from a midwife must be upheld unless they could not reasonably be conceived as serving that purpose.

IV.

Appellees offer two state interests to justify the New Jersey regulatory scheme: the interest in protecting the health and welfare of the mother and the interest in protecting the health and welfare of the child. These are legitimate state interests. See, e.g., Roe v. Wade, 410 U.S. 113, 163-64 (1973) (recognizing the state's interest in both the health of the mother and the viable fetus).

The regulatory scheme is also rationally related to these state interests. Each of the complained of requirements -- (1) that applicants have at least 1800 hours of instruction, (2) that this instruction comes from a school of midwifery or a maternity hospital rather than an apprenticeship, N.J. Stat. Ann. § 45:10-3, and (3) that the application be indorsed by a registered physician, id. § 45:10-3 -- "might be thought" to further the state's interest in assuring that would-be midwives are qualified to perform their jobs. Assuring that midwives are qualified, in turn, is rationally related to the state's valid interest in the health and safety of both mother and child. See Dent v. West Virginia, 129 U.S. 114 (1889) (upholding doctors' licensing requirements because states have a legitimate interest in regulating the medical profession); Williamson v. Lee Optical of Oklahoma, Inc., 348 U.S. 483 (1955) (state may forbid opticians from fitting or duplicating lenses without a prescription from an ophthalmologist or optometrist).

The appellants maintain that the 1800 hours of instruction requirement is not "rationally-related" to New

Jersey's legitimate goal of assuring that midwives are qualified to perform their jobs. While we do not question plaintiffs' sincerity when they voice this opinion, it is sufficient to conclude that this is a matter about which reasonable minds can differ. As the district court noted "1800 hours, or forty-five weeks of full time training, is not an irrational length of time, considering the serious nature of the work performed by midwives." (Dist. Ct. Op. at 13.) The mere fact that some students might perform as competent midwives without going through the full 1800 hours of training does not make the requirement "irrational." The New Jersey legislature may well have decided that the 1800-hour training requirement will assure that midwives who go through 1800 hours' instruction are competent <u>often enough</u> to justify the burden to students who are competent at some point before 1800 hours of study. We cannot say that the requirement is irrational given New Jersey's interests in both the technical competence of the entire population of midwives and the health of the entire population of midwife consumers. While different training requirements might also further New Jersey's valid goals, "it is for the legislature, not the courts, to balance the advantages and disadvantages of the . . . requirement." <u>Williamson</u>, 348 U.S. at 487.

A similar analysis reveals the rationality of the other statutory requirements. The requirement that would-be midwives receive their training through instruction at schools of midwifery or maternity hospitals rather than through the

apprenticeship training also reflects a legislative judgment about which reasonable minds can differ. We simply cannot say it is irrational to believe that midwives trained in schools of midwifery or at maternity hospitals on the whole are better able to protect the health of New Jersey mothers and children.

Plaintiffs profess concern about the physician indorsement requirement because it "imposes a significant barrier to entry upon persons seeking to practice midwifery." This is true, they allege, "since direct entry midwives are broadly perceived . . . as potentially competing with obstetricians" and physicians have a conflict of interest when asked to vouch for the qualifications of an aspiring direct entry midwife. (App. at 24.) While the complaint does not identify any otherwise qualified candidate who has allegedly asked and been refused indorsement, plaintiffs ask for the opportunity to prove that this "significant barrier" exists even where an applicant is otherwise qualified.

It is, of course, rational to believe that an obstetrician asked to indorse the qualifications of a midwife candidate will not be a wholly objective evaluator of a candidate's qualifications. One can also make a substantial policy argument that the benefit to be derived from a physician indorsement requirement is outweighed by the burden it places on candidates. It is not irrational, however, (1) to find value in soliciting the views of a medically trained individual who has had some personal contact with the candidate and has checked into his or her credentials, or (2) to conclude that there are

sufficient members of the medical profession willing to perform this public service in good faith to make such a requirement workable.[0]

                              V.

        The root of this controversy is that plaintiffs believe apprenticeship training is as valuable as more formal training and that an examination could be devised that would assure adequate quality control.  They may be right.  However, the elected representatives of the people of New Jersey who voted for the statute took a contrary view.  While there are disputes of legislative fact involved in this disagreement, those disputes are not legally relevant under substantive due process jurisprudence.

        The concern of the parents is that the statute makes it "practically impossible . . . to attain the substantial benefits -- in terms of access, cost and safety -- which can be made available through the use of direct entry midwives" and that as a result their "significant efforts" to identify direct entry midwives able and willing to assist them in home birthing in New Jersey have been unsuccessful.  As we have pointed out, however, the parents have no constitutional right to their choice of a

---

[0]  The plaintiffs also claim that the midwife examination has not been given for many years.  They do not claim that anyone has asked and been denied the opportunity to sit for the examination, however.

health care provider who does not meet quality control standards that a legislator might reasonably conceive to be desirable.[0]

## VI.

This controversy is one this court is not authorized to resolve and the plaintiffs must take their evidence and advocacy to the halls of the New Jersey's legislature. The judgment of the district court will be affirmed.

---

[0] The complaint does not allege that the parents have made futile efforts to secure a <u>licensed</u> midwife to assist in home delivery. Appellants' brief suggests, however, that at least some licensed midwives prefer not to assist in home deliveries. Assuming this to be true, it does not provide a basis for attacking a statute which not only does not prohibit home birthing but also reflects no preference for hospital deliveries.