Sonali IYENGAR, et al., Plaintiffs,

v.

Jo Anne B. BARNHART,
et al. Defendants.

No. CIV.A.02–0825 ESH.

United States District Court,
District of Columbia.

Nov. 26, 2002.

Rajiv Santosh Khanna, Gaillard Hunt, Arlington, VA, for Plaintiffs.

Sharad S. Khandelwal, U.S. Department of Justice, Civil Division, Federal Programs Branch, Washington, DC, for Defendants.

## MEMORANDUM OPINION

HUVELLE, District Judge.

In this case, several aliens who reside legally in the United States, but are not eligible to work in this country, invoke the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*, to challenge the Social Security Administration's ("SSA") recent determination that it would no longer issue social security numbers ("SSNs") to such aliens for purposes of obtaining state drivers' licenses. This determination—based on SSA's new interpretation of its own regulations—reversed the agency's long-standing position concerning the issuance of SSNs to nonworking aliens. Since this interpretation took effect, plaintiffs have all applied for SSNs, but their applications have been rejected. Because plaintiffs are residents of Illinois and Alabama, two states that require those applying for drivers' licenses to have SSNs, they contend that SSA's action has prevented them from becoming licensed drivers.

Accordingly, plaintiffs seek an injunction barring SSA from enforcing its new policy, as well as monetary relief to compensate them for the expenses they have incurred as a result of being denied SSNs. Before the Court are defendant's motion to dismiss and to strike and plaintiffs' motion for summary judgment. Because the Court finds that the SSA was required to use the APA's notice and comment procedures before issuing its revised interpretation, it will grant plaintiffs' motion in part and deny defendant's motion in part. However, while plaintiffs are entitled a injunction invalidating the policy, they are barred on grounds of sovereign immunity from obtaining money damages from the SSA. Plaintiffs' claims for damages must therefore be denied. All other pending motions, including plaintiffs' motions for class certification and for a preliminary injunction, will be denied as moot.

## BACKGROUND

### I. Statutory and Regulatory Background

SSA issues social security numbers primarily to establish and maintain records of the earnings of employed persons. All U.S. citizens are entitled to a SSN, as are legal aliens who have been authorized to work in this country. *See* 42 U.S.C. § 405(c)(2)(B)(i); 20 C.F.R. § 422.104(a)(1)-(2). However, just as employment is not the only purpose for which SSNs are used, it is by no means the only purpose for which they are issued. Thus, the Social Security Act requires SSA to assign numbers "to any individual who is an applicant for or recipient of benefits under any program financed in whole or in part from Federal funds." 42 U.S.C. § 405(c)(2)(B)(ii). And, by regulation SSA has extended the class of aliens eligible for SSNs to those "legally in the United States but not under authority of law permitting him or her to engage in employment, *but only for a valid nonwork purpose.*" 20 C.F.R. § 422.104(a)(3) (emphasis added). The interpretation of this phrase lies at the heart of this case.

When § 422.104 was first promulgated in 1974, it authorized SSA to assign SSNs to nonworking aliens for "a nonwork purpose." The word "valid" was added to the

regulation in 1998. (Defs.' Opp. Ex. A (Zwitch Dec.) ¶ 5.) The first interpretation of this phrase by SSA appears to have been in March 1980. In its Claims Manuel ("CM"), which at the time served as the agency's operating instructions, SSA noted several situations where nonworking aliens needed SSNs for purposes other than work: "SSN's will be issued to such individuals who have established their lawful admission to the U.S. and who have indicated a valid nonworking purpose for needing an SSN," including "applying for a driver's license, . . ." CM 2837 (Id., attach. 2.) Next, in the June 1991 version of Record Maintenance ("RM") 00203.510,[1] SSA gave as the example of a "valid nonwork reason" for issuing an SSN the situation where "the alien's state of residence requires an SSN to get a driver's license." RM 00203.510 (Id., attach. 3.)

SSA updated RM 00203.510 in June 1996. Here, the agency listed two categories of valid nonwork purposes. The first was when federal law required a person to have an SSN in order to obtain a benefit or service; the second was when a State or a State's political subdivision imposed such a requirement, and that requirement comported with federal law. Once again, SSA cited state driver's licenses as a valid purpose, but now required the alien seeking an SSN for that reason to provide documentation from the appropriate state entity confirming his identity and stating that

he is entitled to the licence except for his or her lack of an SSN.[2] (Id., attach. 4.)

This brings us to action that has triggered the present case. In March 2002, SSA promulgated yet another version of RM 00203.510. In this document, SSA—for the first time—listed obtaining a state driver's license as an *invalid* nonwork purpose, and set out the agency's new policy that it "will not assign an SSN solely for these purposes." (Id., attach 7.) Once again, SSA's purpose in making this change appears to have been the prevention of fraud. By imposing tighter requirements on the issuance of nonwork SSNs, the agency apparently hoped to further reduce the number of wage reports associated with these numbers. The changed interpretation, which—like those that it replaced—was published only as an RM, and not in the Federal Register, took effect on March 1, 2002. (Id. ¶ 15.) At the same time as it put forward this newly-restrictive interpretation of "valid nonwork purpose," SSA retained the documentation requirements it had imposed in the June 1996 revision of RM 00203.510. (Id., attach. ¶ 16.)

## II. Factual Background

On May 1, 2002, plaintiff Sonali Iyengar initiated this litigation against SSA, challenging the legality of RM 00203.510 under the APA. She amended her complaint on

---

1. RM's are found in SSA's Program Operations Manual System ("POMS"), which in 1979 began to replace the CM as the agency's operations manual.

2. This new documentation requirement was part of an effort to reduce social security fraud by tightening the requirements for obtaining a nonwork SSN. In 1982, as part of a similar antifraud effort, SSA began placing the following legend on all social security cards issued to aliens not authorized to work in the United States: "NOT VALID FOR EMPLOYMENT." This allowed employers to see

at a glance that the holder of the card was not legally permitted to work. However, this policy was not entirely successful, as many employers asked prospective employees to furnish only their SSN itself, rather than the social security card on which the legend appears. Thus, by 1992 the number of wage reports associated with nonwork SSNs had increased to an all-time high of 1,306,192, up from 14,295 in 1974. (Zwitch Dec. ¶ 12.) This number fell to 574,680 by 2001, partly as a result of the new documentation requirements. (Id. at ¶ 15.)

July 12 to add several additional plaintiffs. All plaintiffs are legal aliens not eligible to work in the United States.[3] (Am. Compl.¶ 3.) Seven of the eight are residents of Illinois; the eighth lives in Alabama. Both of those states now require individuals applying for driver's licenses to have valid SSNs.

Prior to September 25, 2001, Illinois had a policy of issuing temporary driver's licenses to applicants who did not have SSNs. These temporary licenses could then be used to meet SSA's documentation requirements for obtaining an SSN. However, Illinois discontinued that policy in the wake of the September 11 terrorist attacks. (Zwitch Dec. ¶¶ 17–18.) Moreover, in October 2001, the State informed SSA that it would no longer issue any documentation to the agency other to the effect that the individual is entitled to a driver's license except for his or her lack of an SSN. (*Id.* at ¶ 20, attach. 11.) Thus, even before SSA actually issued RM 00203.510, Illinois residents would have been unable to secure SSNs in order to become licensed drivers because they could not have fulfilled the agency's documentation requirement. It is not clear whether the State's policy would continue if SSA should once again start accepting the need for a driver's license as a valid nonwork purpose. (Hunt Dec. ¶ 7.)

The situation in Alabama is different. Before the March 2002 changes to RM 00203.510, Alabama's policy allowed aliens applying for driver's licenses to comply with SSA's documentation requirements. After the alien completed various tests required for a driver's license, the alien would have to go to the local Social Security office, which would then request that the State send a copy of the documentation letter on the alien's behalf. This letter would then be faxed directly from the Montgomery Social Office to the relevant Social Security Office. (*Id.*, attach.) While this policy has obviously been rendered moot by SSA's decision not to issue SSNs for driver's licensing, there is every indication that the State would again begin to provide SSA with the necessary documents if such an exercise were once again to become relevant. (*Id.* at ¶ 8.)

In any event, plaintiffs allege that they have applied for driver's licenses in Illinois and Alabama only to be turned down for the sole reason that they lacked SSNs. (Am.Compl.¶¶ 12–13.) They further allege that they have requested that SSA provide them with such numbers, but that the agency has denied their applications pursuant to the newly amended RM 00203.510. (Am.Compl.¶ 14.) Invoking the APA, plaintiffs attack SSA's new interpretation of "valid nonwork purpose" on both procedural and substantive grounds. First, they contend that it was improper for the agency to reverse one of its long-standing regulatory interpretations without using notice and comment rulemaking, *see* 5 U.S.C. § 553. (Am.Compl.¶¶ 17–18.) Second, plaintiffs contend that SSA's new policy is irreconcilable with both the text of the Social Security Act and the agency's existing regulations implementing the Act. (Am.Compl.¶ 15.) Before the Court can reach the merits of these claims, however, it must address the government's argument that plaintiffs lack standing to bring this case.

## ANALYSIS

### I. Standing

■ The standing requirement derives from Article III of the Constitution.

---

**3.** Plaintiffs' immigration status results from their being married to foreign nationals who are living in the United States on valid work visas. While plaintiffs' spouses are entitled to work, they are not.

In order to establish standing to bring suit, a party must demonstrate a concrete and particularized injury that is (1) "actual or imminent"; (2) "caused by, or fairly traceable to, an act that the litigant challenges in the instant litigation"; (3) likely to be redressed by a favorable decision by the Court. *Fla. Audubon Soc'y v. Bentsen,* 94 F.3d 658, 663 (D.C.Cir.1996) (*en banc*); *see also Bennett v. Spear,* 520 U.S. 154, 162, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997); *Animal Legal Def. Fund v. Glickman,* 154 F.3d 426, 431 (D.C.Cir.1998) (*en banc*) ("*ALDF*"). In this case, there is no dispute about the first factor; plaintiffs have clearly suffered an injury-in-fact by virtue of having been denied SSNs. Defendant's standing argument thus centers on the latter two requirements: causation and redressability. (Def.'s Mot. to Dismiss at 4.)

In addressing these issues, it is important to observe at the outset that the elements of causation and redressability are concerned with probabilities, not certainties. The D.C. Circuit made as much clear in *Florida Audubon Society:*

> Causation, or "traceability," examines whether it is *substantially probable* that the challenged acts of the defendant, not of some absent third party, will cause [or caused] the particularized injury of the plaintiff. Redressability examines whether the relief sought, assuming the court chooses to grant it, will *likely* alleviate the particularized injury alleged by the plaintiff.

94 F.3d at 663–64 (internal citations omitted) (emphasis added); *see also Hall v. Norton,* 266 F.3d 969, 976–77 (9th Cir. 2001) (holding that, in order to demonstrate standing, a plaintiff need not "establish causation with the degree of certainty that would be required for him to succeed on the merits, say, of a tort claim"). Thus, in order to for plaintiffs to establish their standing to sue, they need not eliminate all

doubt as to whether the challenged action (the issuance of the new policy regarding the issuance of SSNs for state drivers' licenses) caused them to be denied SSNs. Nor need plaintiffs prove that if the Court orders that SSA's interpretation be rescinded, they will definitely or automatically obtain SSNs. Rather, plaintiffs must show only (1) a substantial probability that SSA's refusal to give them SSNs was or is being caused by the new policy, and (2) a reasonable likelihood that eliminating that policy will result in them obtaining the numbers that they seek.

Defendant's position rests primarily on SSA's documentation requirement. The government points out that plaintiffs have not alleged that they provided the necessary state documentation to SSA when they applied for their SSNs, and argues that they therefore have not satisfied the causation requirement. Such documentation is a prerequisite to obtaining a SSN; thus, plaintiffs' failure to come forward with it—rather than the agency's new policy denying SSNs to aliens needing driver's licenses—may have been the actual cause of SSA's decision not to give numbers to plaintiffs. Moreover, even if a court were to rescind SSA's policy, the documentation requirement would remain in effect. And, given that the evidence that Illinois even then might not provide the necessary documents, defendant contends that plaintiffs cannot satisfy the redressability prong either. A favorable decision would not alleviate plaintiffs' asserted injury because a separate and independent barrier would still prevent SSA from acting on their request. (Def.'s Mot. to Dismiss at 5–6.) While these are serious objections, they are ultimately not persuasive.

First, as to causation, the government may be right that because plaintiffs have not satisfied the documentation requirement, the Court cannot be certain that

they were refused SSNs on the basis of SSA's recently revised policy. However, as explained above, certainty is not the touchstone of the causation inquiry. Plaintiffs need not prove that but for the challenged action, their applications definitely would have been granted. Rather, their burden is only to show the substantial probability that their previous—*or ongoing*—inability to obtain SSNs is linked to the agency's revised policy. Common sense, as well as the record, suggest that it is.

■ The Court's analysis here focuses on the Alabama plaintiff, whose situation presents a more straightforward basis for a finding of standing as compared to the Illinois plaintiffs. It is well-settled that if a single plaintiff has standing to sue, the Court may proceed to the merits without passing on the standing of the other individual plaintiffs. *See ALDF*, 154 F.3d at 429; *City of Roseville v. Norton*, 219 F.Supp.2d 130, 144 (D.D.C.2002). The government does not dispute that the Alabama plaintiff is eligible to obtain a driver's license, save for the fact she lacks an SSN. (Pls.' Mot. for Summ. J., Ex. 1 (Lesele Aff.).) There is thus no reason to think that she could not obtain the documents that SSA demands. However, once the agency's new policy went into effect, there would have been no reason for the State to send documentation on behalf of an alien in plaintiff's position. Thus, while Alabama routinely sent documentation letters to SSA before March 2002, it has not done so since then, and the record indicates that it stopped because SSA's action essentially mooted the State's practice. (Hunt Dec. ¶ 8.)

This all suggests that this plaintiff would likely be able to get the necessary letter from the State if SSA's policy were to change, and once again give Alabama a reason to issue such documentation. (*Id.*) Nevertheless, as long as that policy is in effect, it is futile for plaintiff to try to satisfy the documentation requirement. And it is not the law that a plaintiff's standing must falter on the causation requirement merely because she did not undertake an empty gesture. *See Jackson–Bey v. Hanslmaier*, 115 F.3d 1091, 1096 (2d Cir.1997); *Sammon v. N.J. Bd. of Med. Exam'rs*, 66 F.3d 639, 643 (3d Cir. 1995); *cf. DKT Memorial Fund, Ltd. v. Agency for Int'l Dev.*, 810 F.2d 1236, 1238 (D.C.Cir.1987) (affirming that "otherwise qualified non-applicants may have standing to challenge a *disqualifying* statute or regulation") (emphasis added).

Indeed, it would be illogical to hold than an alien is barred from challenging a policy that flatly denies a federal benefit to individuals in her category merely because she has not persuaded a state to issue a document, otherwise necessary to acquire that benefit, that has been rendered irrelevant by the very policy that the alien seeks to challenge. *Cf. Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666, 113 S.Ct. 2297, 124 L.Ed.2d 586 (1993) ("When the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the former group seeking to challenge the barrier need not allege that he would have obtained the benefit but for the barrier in order to establish standing.").

Put simply, then, the causation issue with respect to the Alabama plaintiff reduces to this: her inability to obtain a SSN (the injury-in-fact) could either be tied to SSA's driver's license policy or instead to her failure to provide SSA with the proper documentation from State authorities. However, in light of the evidence suggesting that the latter failure is linked to the former policy, the Court has little trouble concluding that the ultimate injury is "fair-

ly traceable" to the challenged action either way.

The government's argument concerning redressability primarily targets the Illinois plaintiffs, but this is misleading. As explained above, the case can proceed based solely on the Alabama plaintiff's standing even were the Court to agree that her counterparts in Illinois suffer from redressability problems. Thus, the fact that Illinois has indicated that it will likely not issue documentation letters even if SSA changes its policy is not fatal to plaintiffs' cause, since Alabama has not followed Illinois' lead in this regard. Instead, the evidence suggests that if plaintiffs' position is embraced by the Court, the Alabama plaintiff would be able to obtain the documentation necessary to satisfy SSA's rules. (Hunt Dec. ¶ 8.) Accordingly, with respect to this plaintiff, the Court concludes that there is at least a reasonable likelihood that a favorable decision on the merits would alleviate the underlying injury. Such a decision would allow the Alabama plaintiff to present a complete SSN application to SSA, which the agency would then have no legal basis for rejecting. Because this plaintiff has standing, the infirmities that may plague the Illinois plaintiffs are irrelevant.

Moreover, the government's arguments ignore the special standing doctrine that applies when litigants attempt to vindicate their "procedural rights," such as their right to have notice of proposed regulatory action and to offer comments on such proposal. By attacking SSA's decision to revise RM 00203.510 without notice and comment, plaintiffs have actually mounted a challenge separate and distinct from their attack on the substantive validity of the

agency's new interpretation.[4] *See Lincoln v. Vigil,* 508 U.S. 182, 195, 113 S.Ct. 2024, 124 L.Ed.2d 101 (1993); *Am. Med. Ass'n v. Reno,* 57 F.3d 1129, 1134 (D.C.Cir.1995) (holding that the "APA's procedural requirements are enforceable apart from the reviewability of the underlying action"). Because procedural rights are special, the courts have relaxed the standing rules applicable to such challenges, particularly in relation to redressability. The Supreme Court has held that "where plaintiffs are seeking to enforce a procedural requirement the disregard of which could impair a separate concrete interest of theirs," they can establish standing "without meeting all the normal standards for redressability and immediacy." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 572 n. 7, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

 In other words, "a party within the zone of interests of any substantive authority generally will be within the zone of interests of any procedural requirement governing exercise of that authority"— such as the APA's notice and comment requirements—"at least if the procedure is intended to enhance the quality of the substantive decision." *Int'l Bhd. of Teamsters v. Pena,* 17 F.3d 1478, 1484 (D.C.Cir. 1994). Thus, while would-be litigants' standing to assert violations of procedural rights is undoubtedly connected to their standing to assert violations of the substantive rights threatened by the denial of those procedural protections, the standard for establishing the former is less stringent than for the latter. In addition to a particularized injury (not just an abstract desire to see the government follow its own procedural rules), a plaintiff asserting a procedural violation must show "a causal

---

4. Indeed, as elaborated below, the Court's conclusion that SSA was required to use notice and comment procedures before issuing its revised interpretation leaves it with no occasion to address the merits of plaintiff's

substantive challenge. As such, the Court could have relied solely on the rules governing standing in cases involving procedural rights to support its determination that plaintiffs have standing here.

connection between the government action that supposedly required the disregarded procedure and some reasonably increased risk of injury to its particularized interest." *Fla. Audubon Soc'y*, 94 F.3d at 664; *see also Am. Farm Bureau v. EPA*, 121 F.Supp.2d 84, 97 (D.D.C.2000).

Plaintiffs here have little difficulty meeting these requirements. The procedural right at stake here—the ability to comment on SSA's proposal to no longer issue SSNs to aliens who need them for driver's licenses—is quite obviously linked to their concrete interest, obtaining SSNs. It requires no imaginative leap to conclude that by cutting plaintiffs out of the loop by changing its policy without notice and comment, the agency appreciably increased the risk that plaintiffs' interest would be compromised. They need not demonstrate that their comments would necessarily have made a difference. Rather, all that is necessary is that they show "that the procedural step was connected to the substantive result." *Sugar Cane Growers Co-op. of Fla. v. Veneman*, 289 F.3d 89, 94–95 (D.C.Cir.2002).

Moreover, as the Court has explained above, there is also a substantial probability that the substantive agency action that allegedly disregarded the procedural requirement—the issuance of the revised interpretation—"created a demonstrable risk, or caused a demonstrable increase in an existing risk, of injury to the particularized interests of the plaintiff." *Fla. Audubon Soc'y*, 94 F.3d at 669. A decision to deny SSNs to all aliens seeking them for driver's licensing undoubtedly increases the likelihood that a particular alien who seeks a number for that purpose (especially one like the Alablama plaintiff, who faces no other legal obstacles to her goal) will not get one. For these reasons, plaintiffs here have satisfied the injury and causation requirements necessary for standing to challenge SSA's alleged denial of their procedural rights. It is to the merits of this challenge that the Court now turns.

## II. APA

### A. *Notice and Comment Requirements*

■ The APA exempts from notice and comment "interpretative .rules, general statements of policy, or rules of agency organization, procedure, or practice." 5 U.S.C. § 553(b)(3)(A). Here, defendant argues that SSA's new definition of "valid nonwork purpose" is an interpretive rule, and thus not subject to notice and comment requirements.[5] (Def.'s Opp. at 11–

---

5. Plaintiffs acknowledge that SSA published a notice in the Federal Register announcing proposed changes to the agency's policies on issuing SSNs to legal, non-working aliens. *See* 64 Fed.Reg. 55217 (Oct. 12, 1999). In this "advance notice of proposed rulemaking," the agency announced that it was considering amending 20 C.F.R. § 422.104 to clarify that the only permissible purpose for assigning an SSN to such an alien would be if there was a Federal statute or regulation that requires the alien to have an SSN in order to receive a federally-funded benefit or service to which the alien has established entitlement. Thus, under the proposed change, "SSA would not assign an SSN to an alien for a nonwork purpose solely to be able to receive a State or local benefit or service."

While plaintiffs spend considerable time in their motion for summary judgment arguing that this Notice is too vague and too old to satisfy the APA's notice and comment requirement (Pls.' Mot. for Summ. J. at 4–7), the government nowhere defends its actions on the ground that the notice was sufficient under 5 U.S.C. § 553(b). Instead, it relies solely on the argument that notice and comment procedures were not required because RM 00203.510 was merely an "interpretive rule." (Def.'s Opp. at 11–13.) Accordingly, given the government's apparent concession that the October 12, 1999 Notice is irrelevant, the Court will proceed directly to defendant's contention that its ultimate action was one to which notice and comment obligations simply did not attach.

13.) Distinguishing between interpretive rule and substantive ones is often a very difficult and confusing task, as has been acknowledged on many occasions. *See, e.g., Air Transp. Ass'n of Am. v. FAA*, 291 F.3d 49, 55–56 ("*ATA*") (D.C.Cir.2002); *Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 93 (D.C.Cir.1997); *Am. Mining Congress v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1108–09 (D.C.Cir.1993). Fortunately, however, it is not necessary to grapple with these complexities at present, for the Court concludes that even if the change made in the March 2002 version of RM 00203.510 is properly classified as an interpretive rule, notice and comments obligations nevertheless should have attached to the agency's action.

■ In recent years, the D.C. Circuit has repeatedly held that an agency's ability to escape notice and comment by issuing interpretive rules is limited where the rule at issue changes an existing regulatory interpretation. "When an agency has given its regulation a definitive interpretation, and later significantly revises that interpretation, the agency has in effect amended its rule, something it may not accomplish without notice and comment." *Alaska Prof'l Hunters Ass'n v. FAA*, 177 F.3d 1030, 1034 (D.C.Cir.1999); *Syncor*, 127 F.3d at 94–95 (noting that the modification of an interpretative rule construing a regulation "will likely require a notice and comment procedure"); *Paralyzed Veterans of Am. v. D.C. Arena L.P.*, 117 F.3d 579, 586–87 (D.C.Cir.1997) (holding that it would undermine the APA to "allow an agency to make a fundamental change in its interpretation of a substantive regulation without notice and comment"); *cf.* 5 U.S.C, § 551(5) (defining "rulemaking" to include "amending" an existing rule). As such, "characterization as an interpretive rule does not relieve the [agency] of notice and comment requirements when a valid interpretation exists." *Monmouth Med. Ctr. v. Thompson*, 257 F.3d 807, 814 (D.C.Cir.2001).

This principle applies here. As described above, as early as 1980 SSA interpreted the phrase "nonwork purpose" in 20 C.F.R. § 422.104 to include a legal alien's need for a state driver's license. (Zwitch Dec. ¶ 8 & Ex. 2.) The agency specifically reaffirmed this position on at least two subsequent occasions, in 1991 and again in 1996. (*Id.* ¶¶ 10–11 & Exs. 3–4.) These interpretations all appeared in SSA's operating manuals, the same place that the disputed March 2002 interpretation was published. There is no suggestion that these previous interpretations were somehow invalid or not definitive. *Cf. Paralyzed Veterans*, 117 F.3d at 587 (speech given by mid-level agency official not sufficiently authoritative to trigger notice and comment for agency action imposing a different interpretation; agency technical assistance manual would have been).[6]

Nor is there any question that the agency's new understanding of its regulation is fundamentally inconsistent with the interpretations that preceded it. *Cf. ATA*, 291 F.3d at 56–58 (notice and comment not required where agency had never before set out an interpretation of the underlying regulation actually at odds with the challenged interpretation); *Ass'n of Am. R.Rs. v. Dep't of Transp.*, 198 F.3d 944, 947–50 (D.C.Cir.1999) (same). The March 2002

---

6. Contrary to the government's suggestion (Def.'s Opp. at 13), there is absolutely no indication in the case law that the requirement of notice and comment for revised regulatory interpretations applies only when the agency has changed its interpretation as a result of a new policy generated by a different administration. Nor would such a limitation (even if it existed) help SSA here, as the new policy that plaintiffs challenge quite obviously was issued by a different administration from the ones responsible for the previous interpretations.

version of RM 00203.510 stated flatly that the agency would no longer assign an SSN to nonworking aliens when their sole reason for needing one was to obtain a driver's license. (Zwitch Dec. ¶ 15 & Ex. 7.) This position represented a complete reversal of SSA's prior understanding of § 422.104 and of its policy regarding the issuance of SSNs to aliens in plaintiffs' situation. In this case, therefore, there can be no serious dispute that prior to March 2002, SSA had adopted an "express, direct, and uniform interpretation" of the operative regulations that was diametrically opposed to the interpretation now at issue. *See Ass'n of Am. R.Rs.*, 198 F.3d at 949. These previous interpretations amounted at least 20 years of "administrative common law" permitting aliens to obtain SSNs in order to get state driver's licenses. *Alaska Prof'l Hunters*, 177 F.3d at 1035. Thus, while the agency may ultimately have the discretion to change its policy, it must do so through notice and comment.[7]

B. *Money Damages*

 While plaintiffs are entitled to injunctive relief, they are plainly not entitled to money damages from the agency based on its violation of the APA. Absent an explicit waiver, sovereign immunity bars any suit against the federal government. *See Deaf Smith County Grain Pro-*

cessors, Inc. v. Glickman, 162 F.3d 1206, 1210 (D.C.Cir.1998). The APA provides such a waiver, but its terms are specifically limited to actions seeking relief "other than money damages." 5 U.S.C. § 702. This means that the APA does not waive sovereign immunity for "an action at law for damages—which are intended to provide a victim with monetary compensation for an injury to his person, property, or reputation." *Bowen v. Massachusetts*, 487 U.S. 879, 893, 108 S.Ct. 2722, 101 L.Ed.2d 749 (1988); *cf. Hubbard v. EPA*, 949 F.2d 453 (D.C.Cir.1991) (*en banc*) (holding that actions brought to recover back pay seek money damages, and are thus not covered by the APA waiver). Here, plaintiffs have asked for damages "to recompense their expense and inconvenience caused by defendant's refusal of Social Security numbers." (Am. Compl. ¶ 19.) Such a claim is plainly one for money damages, and thus cannot survive defendant's invocation of sovereign immunity.[8] *See Bowen*, 487 U.S. at 895, 108 S.Ct. 2722 (the term "money damages" refers to "a sum of money used as compensatory relief").

**CONCLUSION**

For the reasons given above, the Court will grant plaintiffs' motion for summary judgment in part and deny that motion in part. SSA was required to use notice and comment procedures before promul-

---

7. In light of this conclusion, the Court need not address plaintiffs' arguments that SSA violated either its own regulations or the Social Security Act in issuing its new interpretation. These questions are best left for another day, if the agency again decides—this time after going through notice and comment—to refuse SSNs to aliens seeking to obtain state driver's licenses.

8. Perhaps recognizing this fatal defect, plaintiffs—in their response to the government's motion to dismiss—attempt to recast their damages claims as constitutional tort claims under *Bivens v. Six Unknown Named Agents*,

403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). (Pls.' Ans. to Def.'s Mot. to Dismiss at 16–17.) Even assuming such a move is permissible, *Bivens* is inapplicable in this case. *Bivens* and its progeny apply only to violations of constitutional rights by individual federal officials. And here, plaintiffs have identified no constitutional provision or protection that defendant's actions are supposed to have trammeled, saying only that their "statutory and regulatory rights" were violated by SSA's decision to deny SSNs for driver's licenses. (*Id.* at 17.) *Bivens* does not extend to statutory and regulatory violations, and thus, it is of no help to plaintiffs.

gating the significant revision of its regulations that plaintiffs have challenged here. The March 2002 version of RM 00203.510 is therefore invalid. However, plaintiffs' claims for money damages based on this APA violation are barred on sovereign immunity grounds. All other pending motions are denied as moot. A separate order accompanies this Memorandum Opinion.

## ORDER

The Court has considered defendants' Motion to Dismiss and to Strike [13–1], plaintiffs' Motion for Summary Judgment [18–1], and defendant's opposition thereto, plaintiffs' Motion for a Preliminary Injunction [15–1], and plaintiffs' Motion for Class Certification [14–1]. For the reasons given in the accompanying Memorandum Opinion, it is hereby

**ORDERED** that plaintiffs' Motion for Summary Judgment is **GRANTED IN PART** and **DENIED IN PART**; it is

**FURTHER ORDERED** that the Social Security Administration's March 2002 version of RM 00203.510 is invalid pursuant to 5 U.S.C. § 553; it is

**FURTHER ORDERED** that defendant's Motion to Dismiss plaintiffs' claims for money damages is **GRANTED**; it is

**FURTHER ORDERED** that plaintiffs' Motion for a Preliminary Injunction is **DENIED** as moot; it is

**FURTHER ORDERED** that plaintiffs' Motion for Class Certification is **DENIED** as moot; and it is

**FURTHER ORDERED** that the above-captioned complaint is dismissed.

**It is so ordered.**