NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

WENDI CLECKNER, *Plaintiff/Appellant*,

*v.*

ARIZONA DEPARTMENT OF HEALTH SERVICES, *Defendant/Appellee*.

No. 1 CA-CV 17-0229
FILED 5-10-2018

Appeal from the Superior Court in Maricopa County
No. LC2016-000185-001
The Honorable Patricia A. Starr, Judge

**AFFIRMED**

COUNSEL

Law Office of Julie Gunnigle, PLLC, Scottsdale
By Julie R. Gunnigle
*Counsel for Plaintiff/Appellant*

Arizona Attorney General's Office, Phoenix
By Patricia C. LaMagna, Jo-Ann Handy, Aubrey Joy Corcoran
*Counsel for Defendant/Appellee*

---

## MEMORANDUM DECISION

Judge Paul J. McMurdie delivered the decision of the Court, in which Presiding Judge Lawrence F. Winthrop and Judge Jennifer B. Campbell joined.

---

**M c M U R D I E**, Judge:

**¶1**　　　　Wendi Lee Cleckner appeals from the superior court's decision to affirm the Department of Health Services' suspension of her license to practice midwifery for one year and to assess a $100 civil penalty.

### FACTS AND PROCEDURAL BACKGROUND

**¶2**　　　　Cleckner is a midwife licensed by the Arizona Department of Health Services ("Department") and, at the time of these proceedings, was the president of the Arizona Association of Midwives.[1] In July 2015, the Department alleged Cleckner violated administrative rules and statutes regulating her professional practice when she failed to schedule a required syphilis test for her client ("Client 1"), and when she continued providing services to a client who developed "[a] postpartum hemorrhage of greater than 500 milliliters in the current pregnancy" ("Client 2").

**¶3**　　　　On April 18, 2013, Client 1 declined, for religious and monetary reasons, to complete a standard prenatal panel of blood tests, including a test for syphilis. Client 1 declined lab testing in writing on a form created by Cleckner, which stated "[y]ou may choose to decline these labs," including the test for syphilis. The Department's standard published form would not have allowed a client to waive syphilis testing. Cleckner

---

[1]　　　A midwife is "a person who delivers a baby or provides health care related to pregnancy, labor, delivery and postpartum care of the mother and her infant." Ariz. Rev. Stat. ("A.R.S.") § 36-751(3). "[N]o person may act as a midwife without being licensed," with statutorily defined exceptions. A.R.S. § 36-752(A); *see also* A.R.S. § 36-754. A midwife is required to have at least a high school diploma or a equivalency diploma, basic training in adult and neonatal cardiopulmonary resuscitation, and certification as a professional midwife by the North American Registry of Midwives. *See* A.R.S. § 36-755; Ariz. Admin. Code ("A.A.C.") R9-16-102(A)(4)–(6).

submitted the signed form to the Department as part of her Midwife Report for Client 1. No syphilis test was performed within Client 1's 28-week gestation, or otherwise.

**¶4** Cleckner testified she explained to Client 1 the risks syphilis infection posed to the infant, and the importance of knowing one's STD status, but that she did not discuss that the syphilis test is a non-waivable requirement for Client 1 to remain in Cleckner's care. Cleckner accepted Client 1's rejection of the test and believed the rules enabled a client to refuse syphilis testing. Thomas Salow, a branch chief of the Department's Bureau of Special Licensing, testified that syphilis testing was never waivable, even under the midwifery rules in effect prior to July 2013.

**¶5** Client 2 experienced a postpartum hemorrhage of greater than 500 milliliters (Cleckner's notes indicate 750 milliliters of blood loss) during the delivery of her child, for which Cleckner administered "1ml of Pitocin" and called Emergency Medical Services ("EMS").[2] By the time EMS arrived, Client 2 had stopped bleeding and exhibited stable vital signs. Alexander Myers, a paramedic with EMS, testified upon arrival his team was advised the bleeding "had resided" and that Client 2 "asked not to be transported or evaluated at that time." EMS never evaluated Client 2 or created a refusal form because a "medical emergency didn't seem to exist." Cleckner, Client 2, and Mona Ziems, Cleckner's apprentice assisting during Client 2's delivery, testified that EMS assessed vital signs. Client 2 could not remember, however, whether she refused transportation directly to EMS, but she testified she did "not want[] to transfer . . . after the bleeding had stopped." Cleckner provided Client 2 with Cleckner's own Transfer of Care Refusal Form, which Client 2 signed. Cleckner testified she did not discuss with Client 2 the requirement for a midwife to transfer care to a different provider after a hemorrhage over 500 milliliters occurs in a pregnancy because it would be "borderline coercion to put that in that perceptive [sic] because they still have bodily autonomy." Client 2's testimony demonstrated that Cleckner failed to explain to her the dangers associated with such a hemorrhage.

**¶6** Hugh Miller, M.D., a board-certified obstetrician gynecologist with additional specialization in maternal fetal medicine and a high-risk obstetrical practice, testified that Pitocin, the antihemorrhagic Cleckner

---

[2] Cleckner testified she called EMS because the rules prescribe so after Pitocin is administered, not because her client suffered 750 milliliters of blood loss.

administered, has a short half-life and can wear off, risking another bleed. In his opinion, postpartum hemorrhage is dangerous because "you don't know what your end game is. I mean you don't know when it's going to stop. . . . [T]he amount of blood that a woman can lose can be massive. It can happen very quickly."

¶7            Cleckner continued providing midwifery services to Client 2 after the client refused to be transferred. Sarita Bennett, D.O., an osteopathic physician and a home-birth midwife practicing in West Virginia, testified on behalf of Cleckner that, although Cleckner attempted to transfer care, Client 2 did not qualify for an emergency transfer, so it was a "good idea" for Cleckner to remain with Client 2 for at least three or four hours after stabilization.[3] However, Bennett admitted she was not familiar with Arizona laws and regulations regarding transferring care.

¶8            Two hearings were conducted before an administrative law judge ("ALJ"), who issued a decision on January 27, 2016, suspending Cleckner's license to practice midwifery for one year, and accessing a civil penalty of $100. Cleckner appealed the ALJ's decision to the Department's Director, who affirmed the decision on February 18, 2016. The superior court affirmed the Director's decision on February 8, 2017, finding the Director did not abuse her discretion by sanctioning Cleckner. The court also ruled Cleckner lacked standing to assert the constitutional claims of her clients. Cleckner timely appealed. We have jurisdiction pursuant to Arizona Revised Statutes ("A.R.S.") sections 12-120.21(A)(1) and -2101(A)(1).

## DISCUSSION

¶9            Cleckner argues the superior court erred by affirming the administrative agency decision because: (1) she has standing to assert the constitutional claims of her clients; (2) the requirement for midwives to ensure their clients have been tested for syphilis, Arizona Administrative Code ("A.A.C.") R9-16-108(I)(3), is unconstitutional when the client provides informed consent opting out of such testing; (3) the Department's interpretation of A.A.C. R9-16-111(B)(25) conflicts with A.R.S. § 36-756(A)(3), creating an unreasonable and absurd construction of the

---

[3]            Client 2's medical condition remained stable, and she did not experience any further bleeding.

law; and (4) the superior court applied an incorrect standard of review of Cleckner's license suspension.

¶10      In reviewing the superior court's decision affirming an administrative order, "[w]e engage in the same process as the superior court," which is to assess "whether the agency's action was arbitrary, capricious, or an abuse of discretion." *Gaveck v. Ariz. State Bd. of Podiatry Exam'rs*, 222 Ariz. 433, 436, ¶¶ 11–12 (App. 2009); *see* A.R.S. § 12-910(E) ("The court shall affirm the agency action unless the court concludes that the agency's action is contrary to law, is not supported by substantial evidence, is arbitrary and capricious or is an abuse of discretion."). "We are not bound by an agency's or the superior court's legal conclusions," *Gaveck*, 222 Ariz. at 436, ¶ 12, and whether substantial evidence supported the agency's decision "is a question of law for our independent determination." *Id.* We must, however, "defer to the agency's factual findings and affirm them if supported by substantial evidence." *Id.* at ¶ 11.

¶11      We also defer to "agencies' interpretations of legislation they are charged with implementing," but remain "the final authority on critical questions of statutory construction." *Robbins v. ADES*, 232 Ariz. 21, 23, ¶ 7 (App. 2013) (quoting *U.S. Parking Sys. v. City of Phoenix*, 160 Ariz. 210, 211 (App. 1989)). We refuse to give weight to an agency's interpretation of a statute within its expertise when the legislature has explicitly addressed the matter. *Stambaugh v. Killian*, 242 Ariz. 508, 512, ¶ 21 (2017). Clear and unambiguous statutory language does not require us to resort to other methods of statutory interpretation. *Haag v. Steinle*, 227 Ariz. 212, 214, ¶ 9 (App. 2011). "Rules and statutes should be harmonized wherever possible and read in conjunction with each other." *State v. Hansen*, 215 Ariz. 287, 289, ¶ 7 (2007) (quotation omitted).

**A.      The Department Did Not Abuse Its Discretion by Suspending Cleckner's License to Practice Midwifery for One Year.**

¶12      Cleckner argues she did not fail to transfer care for Client 2 because Client 2 "no longer had a postpartum hemorrhage" and she "was entitled to resume care" under A.A.C. R9-16-111(B)(25). She further argues the Department's interpretation of A.A.C. R9-16-111(B)(25) conflicts with A.R.S. § 36-756(A)(3) because the Department's interpretation "require[s] a midwife to unilaterally suspend all care upon the occurrence of a postpartum hemorrhage of greater than 500 ml, [which] cause[s] the midwife to engage in conduct detrimental to the [health or safety of the] mother and child," an unreasonable and absurd construction of the law. Cleckner further argues a midwife only needs to "initiate" a transfer of care,

invoking A.A.C. R9-16-111(E)(2), but that the transfer does not need to be completed.

**¶13** Licensed midwives are required to comply with the midwifery licensing and regulation statutes, A.R.S. §§ 36-751 to -760, and the Department's rules of occupational licensing of midwifery, A.A.C. §§ R9-16-101 to -117 ("midwifery rules"). According to § 36-756, "[t]he director may deny, suspend or revoke the license of any midwife who . . . [i]ndulges in conduct or a practice *detrimental to the health or safety of the mother* and child." A.R.S. § 36-756(A)(3) (emphasis added). The midwifery rules proscribe that "[a] midwife shall not . . . *continue* midwifery services for a client who has or develops . . . [a] postpartum hemorrhage of greater than 500 milliliters in the *current* pregnancy[.]" A.A.C. R9-16-111(B)(25) (emphasis added).[4] Upon the occurrence of such a hemorrhage, a midwife is required to *transfer care*, which the regulations define as an "assum[ption of] responsibility for the direct care of the client" by "an emergency medical services provider, a certified nurse midwife, a hospital, or a physician." A.A.C. R9-16-101(47).[5]

**¶14** On July 20, 2014, Cleckner determined Client 2 lost approximately 750 milliliters of blood during the home delivery of her child. When a hemorrhage of that magnitude happened, Cleckner was obligated to transfer care and not "continue" providing midwifery services to Client 2, regardless of the client's wishes or her seemingly improved condition. *See* A.A.C. R9-16-111(B)(25). The language of the rule is unambiguous. Upon a postpartum hemorrhage of greater than 500 milliliters, a midwife "shall not . . . continue" providing midwifery services. *See* A.A.C. R9-16-111(B)(25); *Haag,* 227 Ariz. at 214, ¶ 9. Cleckner was required to pre-arrange a plan with another provider should a care-preventing situation develop. *See* A.A.C. R9-16-111(E)(2) (if a client has a postpartum hemorrhage of greater than 500 milliliters, "a midwife shall . . . [i]nitiate transfer of care"). Although Cleckner argues "initiate" does not include the completion of transfer, the midwifery rules, when read

---

[4]     The rule effective prior to October 1, 2013, encompassed the same requirement, including the necessity to "immediately transfer care." *See* 19 Ariz. Admin. Reg. 1800, 1832 (eff. Oct. 1, 2013) (R9-16-108(A)(20)).

[5]     The rule effective prior to October 1, 2013, stated "'[t]ransfer of care' means that the midwife refers the care of the client to a medical facility or physician who then assumes responsibility for the direct care of the client." 19 Ariz. Admin. Reg. 1800, 1809 (eff. Oct. 1, 2013) (R9-16-101(41)).

together, *see Hansen*, 215 Ariz. at 289, ¶ 7, do not provide for an alternative construction because "transfer of care" is also a defined term requiring a midwife to refer the care of a client to one of the enumerated providers "who then *assumes responsibility* for the direct care of the client." A.A.C R9-16-101(47) (emphasis added); *see also Gutierrez v. Indus. Comm'n*, 226 Ariz. 395, 396–97, ¶¶ 6–9 (2011) (interpretation should give a statute a fair and sensible meaning).

**¶15**        Cleckner failed to transfer care of Client 2 because, as she argues, Client 2 refused transfer to EMS, rendering a contingency plan an "abstract solution," and Cleckner did not contact any other provider pursuant to A.A.C. R9-16-101(47). Cleckner not only failed to explain to Client 2 that the midwifery rules required Cleckner to transfer care once the hemorrhage occurred, she also failed to explain the risks associated with the hemorrhage and Pitocin's short half-life for Client 2's fully informed decision to remain at home. Cleckner, thus, endangered Client 2's health or safety. *See* A.R.S. § 36-756(A)(3).[6]

**¶16**        Because substantial evidence supports the ALJ's decision adopted by the Director, and affirmed by the superior court, we hold the Department did not abuse its discretion by suspending Cleckner's license for one year. *See* A.R.S. § 12-910(E); *Gaveck*, 222 Ariz. at 436, ¶¶ 11–12; *see also* A.R.S. § 36-756(A)(1) and (3), (C) (once the Director finds grounds for suspension, he or she may suspend a license "for any period of time he [or she] deems appropriate").

---

[6]        Cleckner argues she could have resumed care upon EMS's departure because Client 2 "no longer had a postpartum hemorrhage" and because EMS accepted care of Client 2. Cleckner's own testimony, however, belies her argument EMS accepted care for any period of time. Dr. Miller's testimony refuted Cleckner's assessment the hemorrhage subsided when he described the indeterminate nature of postpartum hemorrhage's finality. *See Ortega v. Indus. Comm'n*, 121 Ariz. 554, 557 (App. 1979) ("[I]t is the hearing officer's obligation to resolve conflicting medical evidence, and his resolution will not be disturbed unless it is wholly unreasonable."). Most importantly, the midwifery rules do not allow a midwife to resume care once the hemorrhage had occurred, and mandate the necessity of transferring care. *See* A.R.S. § 36-756(A)(3); A.A.C. R9-16-111(B)(25); A.A.C R9-16-101(47).

**B.** **The Department Did Not Abuse Its Discretion by Imposing a $100 Civil Penalty.**

**¶17** Cleckner argues the requirement for midwives to ensure their clients have been tested for syphilis is unconstitutional when the client provides informed consent to opt-out of such testing.

**¶18** Any person "permitted by law to attend pregnant women but not permitted to take blood samples *shall* cause a sample of the blood of each pregnant woman attended by him [or her] to be taken . . . [and] *shall* have the sample submitted to an approved laboratory for a standard serological test for *syphilis*." A.R.S. § 36-693(B) (emphasis added). By statute, *all* pregnant women attended to by a health care provider, *see* § 36-693, are required to be tested for syphilis, a requirement also recognized by the Department's regulations of midwifery. *See* A.A.C. R9-16-108(I)(1)(f) (during the prenatal period, the midwife shall schedule or arrange a client to be tested for "[s]yphilis as required in A.R.S. § 36-693").[7] The regulation of midwifery further proscribes that "[d]uring the prenatal period, the midwife *shall*: . . . *except as provided in R9-16-110*, ensure that the tests in section (I)(1) are completed by the client within 28 weeks gestation." A.A.C. R9-16-108(I)(3) (emphasis added). The midwifery rule, A.A.C. R9-16-110 (assertion to decline required tests), which prescribes a procedure for a client to decline testing, specifically excludes A.A.C. R9-16-108(I)(1)(f) (statutory requirement for a syphilis test) from any waiver.

**¶19** Cleckner, however, created her own form that stated "[y]ou may choose to decline these labs," including the test for syphilis, which Client 1 signed. Cleckner's form was non-compliant with state law as Cleckner was required to inform Client 1 the syphilis testing was mandatory. *See* A.R.S. § 36-693(B); A.A.C. R9-16-108(I)(1)(f). Cleckner testified she discussed testing with Client 1, but not the necessity for the syphilis test. Cleckner also accepted Client 1's rejection of that test and believed the rules, then in effect, enabled her clients to refuse syphilis

---

[7] The rule effective prior to October 1, 2013, included the same requirement. *See* 19 Ariz. Admin. Reg. 1800, 1826 (eff. Oct. 1, 2013) (R9-16-106(E)(1)(d)).

testing.[8] Salow testified for the Department that syphilis testing was never waivable, even under the midwifery rules in effect prior to July 2013.

**¶20**　　Cleckner argues Client 1 had a constitutionally guaranteed "bodily autonomy" and an "ability to make informed choices about her health care or refuse care altogether." Assuming, without deciding, that Client 1 had such a right, *see Rasmussen by Mitchell v. Fleming*, 154 Ariz. 207, 214–15 (1987) ("[t]he right to refuse medical treatment is a personal right sufficiently 'fundamental' or 'implicit in the concept of ordered liberty'" under the United States Constitution and "the Arizona Constitution also provides for a right to refuse medical treatment") (quoting *Paul v. Davis*, 424 U.S. 693, 713 (1976)), that right does not determine the scope of a midwife's practice; the midwifery rules do. *See* A.R.S. §§ 36-751 to -760; A.A.C. §§ R9-16-101 to -117.[9] We thus reject Cleckner's argument the Department unconstitutionally limited the scope of midwifery only to clients who have tested for syphilis. *See Lange-Kessler v. Dep't of Educ. of N.Y.*, 109 F.3d 137, 141–42 (2d Cir. 1997) (no constitutional right to choose a direct-entry midwife to assist with childbirth); *Sammon v. N.J. Bd. of Med.*

---

[8]　　Cleckner justified Client 1's declination for monetary and religious reasons. Syphilis testing, however, "shall be made by the state laboratory without charge." A.R.S. § 36-693(C). Financial concerns were not at issue, and no religious freedom arguments were advanced by either party.

[9]　　Cleckner argues she has standing to assert the rights of Clients 1 and 2 to refuse treatment or testing because otherwise she "must violate her client's rights in order to avoid being fined." We do not, however, reach the issue of Cleckner's standing to raise the applicable statutes' and rules' constitutionality because we first review a sanction's reasonableness before we reach constitutional grounds as "[i]t is sound judicial policy to avoid deciding a case on constitutional grounds if there are nonconstitutional grounds" available. *See Stoddard v. Donahoe*, 224 Ariz. 152, 157, ¶ 23 (App. 2010) (alteration in original) (quoting *Goodman v. Samaritan Health Sys.*, 195 Ariz. 502, 505, ¶ 11 (App. 1999) (because the applicability of an immunity statute, which could have resolved the case on nonconstitutional grounds, was not before the *Goodman* court, the court addressed constitutional arguments)). Here, the Department acted within its discretion when it sanctioned Cleckner as she was not free to act outside of the scope of her license, *even if requested to do so by a client*. Moreover, assuming, without deciding, Cleckner had standing to raise her Clients' rights, as discussed above neither Clients' decision to reject treatment or testing was fully informed.

*Exam'rs*, 66 F.3d 639, 647 (3d Cir. 1995) ("[P]arents have no constitutional right to their choice of a health care provider who does not meet quality control standards that a legislator might reasonably conceive to be desirable.").

**¶21** Even assuming a client has the "right" to decline testing for syphilis, Cleckner could not continue care of that individual without violating the scope of midwifery practice controlled by state statute and regulations. *See* A.R.S. § 36-693(B); A.A.C. R9-16-108(I)(3). Therefore, we affirm the superior court's ruling because Cleckner failed to practice within the scope of her license and the Department was authorized to assess a $100 civil penalty against her. *See* A.R.S. 36-756(D) ("[T]he director may assess a civil penalty of not more than one hundred dollars for each violation of this article or a rule adopted pursuant to this article . . . . Each day that a violation continues constitutes a separate offense.").

**C.** **The Superior Court's Application of the Incorrect Standard of Review is Harmless in this Case because We Review the Record** *De Novo***.**

**¶22** Cleckner argues the superior court applied an incorrect standard of review to Cleckner's license suspension. We agree.

**¶23** In its decision, the superior court applied the shock-one's-sense-of-fairness standard of review of the Director's discretionary decision, citing to *Schillerstrom v. State*, 180 Ariz. 468, 471 (App. 1994) ("[A]n administrative penalty is excessive only if it is so disproportionate to the offense as to shock one's sense of fairness."). We have previously determined "the 'shocking' inquiry is an imprecise attempt to define the 'arbitrary and capricious' or 'abuse of discretion' standard in § 12-910(E)." *Coplan v. Ariz. State Bd. of Appraisal*, 222 Ariz. 599, 602, ¶ 8 (App. 2009) (quoting A.R.S. § 12-910(E)). Our supreme court has expressly departed from applying the "shocking" standard for administrative agency reviews. *See Maricopa County Sheriff's Office v. Maricopa County Emp. Merit Sys. Comm'n*, 211 Ariz. 219, 223, ¶¶ 20–21 (2005).

**¶24** Having determined that the superior court applied an insufficiently deferential standard of review, we now proceed to independently review the Director's decision. *See Coplan*, 222 Ariz. at 602, ¶ 9. In reviewing an appeal from the superior court affirming an administrative decision, "[w]e engage in the same process as the superior court," to evaluate agency's discretionary rulings. *Gaveck*, 222 Ariz. at 436, ¶¶ 11–12; *see* A.R.S. § 12-910(E). Based on our independent review, we have

determined the Department's decision was supported by substantial evidence, and the sanctions imposed were consistent with the Department's statutory authority. *See* A.R.S. § 36-756(A)(1) and (3), (C). The Department's decision was not contrary to law, arbitrary or capricious, or an abuse of discretion. *See Coplan*, 222 Ariz. at 603, ¶ 12; *see also Taylor v. Ariz. Law Enf't Merit Sys. Council*, 152 Ariz. 200, 207 (App. 1986) ("The determination of the penalty imposed by an administrative body will not be disturbed unless there has been a clear abuse of discretion."). Accordingly, we affirm the Department's decision.

## II.        Attorney's Fees on Appeal.

**¶25**        Cleckner requested we award her attorney's fees pursuant to A.R.S § 12-348(A)(2) and Arizona Rule of Civil Appellate Procedure 21. Section 12-348 authorizes an award of costs, fees, and other expenses to a party, other than this state, that prevails by an adjudication on the merits in "[a] court proceeding to review a state agency decision pursuant to . . . [a] statute authorizing judicial review of agency . . . decisions." A.R.S § 12-348(A)(2). Because Cleckner did not prevail on the merits, we decline to award her costs, fees, and other expenses.

## CONCLUSION

**¶26**        For the reasons stated above, we affirm the superior court's ruling affirming the Department's decision to suspend Cleckner's license for one year and assess a $100 civil penalty. The stay of that suspension, previously entered by the court, is lifted.

